**Terri L. JENKINS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 04–CM–1519.**

District of Columbia Court of Appeals.

Submitted May 15, 2006.
Decided June 15, 2006.

---

**13.** All communications between Respondent and the practice monitor are subject to disclosure under Rule 1.6(I).

Thomas T. Heslep, Washington, DC, appointed by the court, filed a brief, for appellant.

Kenneth L. Wainstein, United States Attorney, and Roy W. McLeese III, Elizabeth Trosman, Steven Kaufman, and Bernard J. Delia, Assistant United States Attorneys, filed a brief, for appellee.

Before SCHWELB, GLICKMAN, and KRAMER, Associate Judges.

SCHWELB, Associate Judge:

The government charged Terri L. Jenkins with three counts of attempted threats to do bodily harm.[1] The three counts related to allegations of conduct occurring on the following dates:

Count F:        March 8, 2004

Count G:        February 25, 2004

Count H:        March 27, 2004

Following a non-jury trial, Ms. Jenkins was found not guilty with respect to Count G, but convicted of the other two counts. On appeal, Ms. Jenkins contends, with respect to Count F, that the prosecution failed to call a witness who was said to have heard the alleged threat, and that the trial court committed plain error by not granting Ms. Jenkins' motion for judgment of acquittal upon that ground. Ms. Jenkins also claims that the evidence was insufficient to support her conviction of Count H. We affirm.

## I.

### BACKGROUND

This case arises from threats allegedly made by Ms. Jenkins as a result of the failure of the complaining witness, Towanda Hunter, to pay Ms. Jenkins several hundred dollars that she owed Ms. Jenkins for the use of Ms. Jenkins' cellular telephone. Ms. Hunter's testimony that some of these threats were made was supported in part by Yvette Yorkshire, with whom

Ms. Hunter had a romantic relationship. Ms. Jenkins' defense with respect to Count H was supported by Rhonda Bowlding, who was Ms. Jenkins' romantic partner. The above-named four women were the only witnesses at the trial.

It is undisputed that in 2003 Ms. Jenkins lent Ms. Hunter a cell phone on the understanding that Ms. Hunter would pay for any calls that she made; that Ms. Hunter was substantially in arrears;[2] and that in late February 2004, Ms. Yorkshire paid Ms. Jenkins $150 on Ms. Hunter's behalf in partial payment of the arrearage. This is the context in which Ms. Jenkins' alleged threats to Ms. Hunter are said to have occurred.

## II.

### THE FEBRUARY 25, 2004 INCIDENT

The government claimed that on February 25, 2004, Ms. Jenkins called Ms. Hunter and Ms. Yorkshire and threatened to "firebomb" their apartment if the money that Ms. Hunter owed her was not repaid. Both Ms. Yorkshire and Ms. Hunter testified that this threat was made; Ms. Jenkins denied it. The trial judge did not credit Ms. Yorkshire's testimony:

I have a lot of trouble [with] Ms. Yorkshire's testimony, I really do. I think that there's some things that I'm not understanding that to me cast some doubt about her credibility.

Thus, although the judge stated that "I don't have that same view about Ms. Hunter," she told Ms. Jenkins' attorney that "on the February 25th, I'm not finding

---

1. Ms. Jenkins was originally charged with making threats to do bodily harm, on each of these dates, in violation of D.C.Code § 22–407 (2001). The government subsequently moved to amend the information, and the trial judge granted the government's motion. "[T]he government was permitted to charge [Ms. Jenkins] with attempted threats even though

it could prove the completed offense." *Evans v. United States,* 779 A.2d 891, 894 (D.C. 2001).

2. Ms. Jenkins claimed that Ms. Hunter owed her $1300; Ms. Hunter claimed that the amount of the debt was $540.

your client guilty on that because I have too many questions about credibility there." Accordingly, Ms. Jenkins was acquitted of Count G.[3]

## III.

### THE MARCH 8, 2004 INCIDENT

Yvette Yorkshire testified that on March 6, 2004, the tires of her car were slashed.[4] Ms. Hunter testified that two days later, on March 8, 2004, Ms. Jenkins called her at work and threatened "to peel back my head if I didn't give her the money." Ms. Hunter stated that she understood "peeling back your head" to be "a street term for I'm going to shoot you in the head." Ms. Hunter further testified that Ms. Jenkins' call was on the speaker phone "because I had a witness standing there when I was talking to [Ms. Jenkins]." She identified the witness as "Captain Sharon Brooks."

Ms. Yorkshire testified that on March 8, she was driving her car to work when Ms. Jenkins pulled alongside in a red BMW. According to Ms. Yorkshire, Ms. Jenkins told her that "if I don't get my money I'm going to peel your girl's head back." When she was asked what this phrase means, Ms. Yorkshire illustrated by moving her hand "in the shape of pulling a trigger on a gun."

Ms. Jenkins admitted that she called Ms. Hunter at work, and she testified that she told Ms. Hunter that she needed to be paid "because there's people at this point that I owe." Ms. Jenkins denied making any threats:

Q  Did you at any time on March 8th threaten to peel back her hair?

A  No. That's not going to get my money.

Q  At any time throughout February and March, did you make any threats whatsoever to her?

A  No. We argued back and forth on the phone, but there was never any threats.

Q  Did she make threats to you?

A  No. We mainly argued. A lot of name calling, but no threats.

The trial judge noted that Ms. Hunter "specifically identified a person who was present" at the time Ms. Jenkins made the alleged threat,[5] and that Ms. Jenkins did not deny calling Ms. Hunter at work. The judge found Ms. Hunter's testimony that that threat was made on the 8th to be "reasonably credible based on those factors that tended to corroborate." Although "reasonably credible" may not come across as the most resounding endorsement, the judge then reiterated that "I think that Ms. Hunter's testimony was credible." Accordingly, the judge found Ms. Jenkins guilty of Count F.

■ On appeal, Ms. Jenkins asserts that her conviction of this count should be reversed because the prosecution failed to call "a readily available corroborating witness." She acknowledges that this point was not raised in the trial court, and that the "plain error" standard applies. Under that standard, Ms. Jenkins must show that the error was plain or obvious, that it seriously affected the fairness or integrity

---

3. Obviously, the acquittal was not appealable. We discuss Count G solely to place the other two counts in context.

4. Ms. Yorkshire volunteered that "I did call the police when my tires were slashed. I have a report on that, but the witness that seen Ms. Jenkins at the car, we couldn't get in

contact with." On motion of the defense, the trial judge ordered this statement stricken.

5. Curiously, the judge did not mention that the person present—Captain Wallace—did not testify, but Ms. Jenkins' attorney did not raise that point either.

of the proceedings, and that it resulted in a miscarriage of justice. *Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *Harris v. United States,* 602 A.2d 154, 159 (D.C. 1992) (en banc); *see also Hunter v. United States,* 606 A.2d 139, 144 (D.C.), *cert. denied,* 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992) ("The defendant's burden in plain error cases is, and should be, a formidable one."). More specifically, Ms. Jenkins must demonstrate that the trial judge plainly erred by not intervening, *sua sponte,* and by not ruling, without such a claim having been made, that Ms. Jenkins must be acquitted because Captain Brooks was not called as a prosecution witness. *See Butts v. United States,* 822 A.2d 407, 419 (D.C.2003); *Irick v. United States,* 565 A.2d 26, 37 (D.C.1989).

■■■ Although Ms. Jenkins' attorney has not explicitly used the term, he is in reality making a kind of "missing witness" argument.[6] He is asserting, in substance, that an inference should be drawn against the government because it failed to call an available witness. Further, he claims that, in the present case, this inference is so strong that Ms. Jenkins should have been acquitted of the charge. But in order to lay a foundation for a missing witness argument, Ms. Jenkins must show that the witness was peculiarly available to the prosecution and that her testimony would elucidate the transaction. *Graves,* 150 U.S. at 121, 14 S.Ct. 40; *Strong v. United States,* 665 A.2d 194, 197 (D.C.1995).

In this case, Captain Brooks was not shown to be "peculiarly available" to the government. The record reflects no attempt by the defense to call Captain Brooks as a witness, or even a request for an opportunity to interview her. "Missing witness" analysis is therefore inapplicable.

■■■ Moreover, the missing witness doctrine should be sparingly invoked, for courts must be mindful of the dangers of creating evidence from non-evidence. *Thomas v. United States,* 447 A.2d 52, 58 (D.C.1982). "[I]t seldom will constitute error to deny the missing witness instruction or to prohibit argument of the missing witness inference." *Stager v. Schneider,* 494 A.2d 1307, 1313 (D.C.1985). *A fortiori,* rejection of a missing witness argument can rarely, if ever, constitute *plain* error.[7]

## IV.

## THE MARCH 27, 2004 INCIDENT

### A. The evidence.

On March 27, 2004, Ms. Jenkins had borrowed Ms. Bowlding's car, and she testified that someone slashed the tires. The two women suspected Ms. Hunter and Ms. Yorkshire. They went to the residence at which Ms. Hunter and Ms. Yorkshire were living, and they knocked loudly on the door. The events that occurred thereafter are in dispute. Because, for purposes of determining evidentiary sufficiency, the record must be viewed in the light most favorable to the prosecution, *Rivas v. United States,* 783 A.2d 125, 133–37 (D.C. 2001) (en banc); *In re T.M.,* 577 A.2d 1149, 1151 (D.C.1990) (standard for bench trials), we focus primarily on the description of

---

6. "[I]f a party has it peculiarly within his power to produce a witness whose testimony would elucidate the transaction, the fact that he does not do it creates [an inference] that the testimony, if produced, would be unfavorable." *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893).

7. *Robinson v. United States,* 825 A.2d 318 (D.C.2003), cited by Ms. Jenkins, is inapposite. That case concerned the *Jencks* Act, 18 U.S.C. § 3500, and discovery violations. No such issue arose in this case.

events provided by Ms. Hunter and, to some extent, by Ms. Yorkshire.

According to Ms. Hunter—the witness primarily credited by the trial judge—she first saw Ms. Jenkins kicking the door. Ms. Hunter testified that

> she was saying something about let me in, open the door. It was so much stuff was said, called me all kinds of b's. It was a lot of things pretty much going on. She was like, something about, because I don't want to misquote anybody, but it was I think at that point I called the police and pretty much I just put the phone up to the door so they could hear exactly what she was saying.

On redirect examination, Ms. Hunter was asked by the prosecutor to "please just state what you perceived as a threat to you that Ms. Jenkins said," and she responded:

> Well, she first she offered me to come outside and pretty much at that point when a person is kicking, yanking on your door, knowing that you don't tell them, look just go ahead, as a matter of fact, I said to her, just take me to court and we can pay the bill and I did say that.

Ms. Hunter then added:

> I don't want to lie on nobody, I'm not going to sit here and fabricate nothing, I'm not going to do no perjury for anybody. I'm only going to state the facts and only what I can recall and what I remember, that's it.

> * * *

> Pretty much she was kicking the door. Just kept kicking the door, shaking the handle. Let me in. Whatever else she was saying[,] I can't remember, it's been

so long, so, I'm not just going to sit here and say well this happened, that happened, I'm just going to state the facts.

Ms. Yorkshire testified that there were four, not two, people outside "trying to kick down the door" and yelling "open this MF"n door." She stated that Ms. Hunter told her not to open the door. According to Ms. Yorkshire, Ms. Hunter asked her to "let me call the police because we had a restraining order on Terri." Neither Ms. Hunter nor Ms. Yorkshire identified any actual verbal threat; their focus was on the demands by Ms. Jenkins and Ms. Bowlding that Ms. Hunter and Ms. Yorkshire either open the door or come out.[8]

The trial judge found that the March 27 incident occurred as Ms. Hunter described it. She found Ms. Hunter's version to be corroborated by the call to the police because, in the judge's words, "I mean you don't just call the police for the heck of it." The judge ruled that even though the words "come outside" may not have been an explicit threat to do bodily harm, a reasonable person could interpret the words as such a threat in the context of the shouting and the banging on the door, the previous threat of March 8, 2004, and the failure of Ms. Hunter to pay her debt.

B. *Legal analysis.*

■ Section 22–407 of the District of Columbia Code is entitled "Threats to do bodily harm." It provides in pertinent part that "[w]hoever is convicted in the District of threats to do bodily harm shall be fined not more than $500 or imprisonment not more than 6 months, or both." In the present case, viewing the record of

---

8. Ms. Jenkins' account of the incident was that she simply asked if Ms. Hunter was at home, and that Ms. Yorkshire answered in the negative. Ms. Jenkins started to leave, but then heard Ms. Hunter's voice, and she asked Ms. Hunter to come out. When the restrain-

ing order was mentioned, Ms. Jenkins walked to the car. According to both Ms. Jenkins and Ms. Bowlding, the latter did most or all of the knocking or banging on the door. The judge, however, apparently did not believe the defense version of events.

the March 27 incident in the light most favorable to the prosecution, we conclude that the evidence was sufficient to support Ms. Jenkins' conviction.

The event that precipitated the March 27 encounter was apparently Ms. Jenkins' belief (whether or not correct) that Ms. Hunter was responsible for the slashing of the tires of the car that Ms. Jenkins had borrowed from Ms. Bowlding. It is not unreasonable for someone in Ms. Jenkins' situation to be upset and angry and to want to confront Ms. Hunter about the tires (and, for that matter, about the unpaid debt). Ms. Jenkins had the right to seek to have a conversation with Ms. Hunter—even an angry conversation—and we must be careful not to permit a statute that prohibits threats to be applied in a manner that limits First Amendment rights. *See generally Watts v. United States,* 394 U.S. 705, 707–08, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam) (holding that a hypothetical rhetorical threat against the President in the context of a political protest was constitutionally protected). In this case, "open the door" or "come out" was not political speech, but if one were to consider the words alone, Ms. Jenkins would indisputably have had a right to say what she said.

▊ The District's felony threats statute, which contains terminology similar to the misdemeanor provisions under which Ms. Jenkins was prosecuted, was analyzed by this court in *United States v. Baish,* 460 A.2d 38 (D.C.1983). There, we stated that the statute

> plainly phrases the conduct it prohibits as "whoever threatens." To "threaten" is "to utter threats against." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1966). A "threat," in turn, is defined as

"[a] *communicated* intent to inflict physical or other harm on any person or on property." BLACK'S LAW DICTIONARY (1979) (emphasis added). We read these definitions together to say that a person "threatens" when she *utters words, which are intended to convey her desire to inflict physical or other harm on any person or on property . . . .*

*Id.* at 42 (emphasis added; footnote omitted).[9] The focus of the statute is thus on the words "uttered" by the defendant. It evidently contemplates verbal threats, and the Baish decision makes no reference to non-verbal conduct. Nevertheless, the words uttered by the defendant must be considered in the context in which they were used. "No precise words are necessary to convey a threat." *Griffin v. United States,* 861 A.2d 610, 616 (D.C.2004). Society proscribes threats of violence to protect individuals "from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

In finding Ms. Jenkins guilty of Count H, the trial judge looked beyond the words spoken, and focused upon what the words would mean to a reasonable person in Ms. Hunter's position in light of the preceding history. The judge relied primarily on *Clark v. United States,* 755 A.2d 1026 (D.C.2000). In that case, the defendant stated to a female police officer who had arrested him: "You won't work here again, wait until I tell the boys, they will take care of you. . . . You think I'm playing, just watch and see. . . . You won't work anywhere after I tell the boys!" The officer took these words to mean that the defendant "would arrange for boys in the neighborhood to do something to her so that she

---

9. The statute at issue in Baish prohibited threats against property as well as threats to

do bodily harm.

would be physically incapacitated from working." *Id.* at 1028. The defendant was convicted of threats, and this court affirmed his conviction. We stated in pertinent part:

> Words cannot always be read in the abstract and often acquire significant meaning from context, facial expression, tone, stress, posture, inflection, and like manifestations of the speaker and the factual circumstances of their delivery. *See State v. Howe,* 247 N.W.2d 647, 654 (N.D.1976) ("No precise words are necessary to convey a threat. It may be bluntly spoken, or done by innuendo or suggestion. A threat often takes its meaning from the circumstances in which it is spoken and *words that are innocuous in themselves may take on a sinister meaning in the context in which they are recited.*") (citation omitted). Whether a particular statement constitutes a threat is a question of fact for the jury. *See United States v. Fulmer,* 108 F.3d 1486, 1492 (1st Cir.1997) ("Whether a given [statement] constitutes a threat is an issue of fact for the trial jury. The use of ambiguous language does not preclude a statement from being a threat. While the statement on its face may be susceptible to more than one interpretation, some factors ... such as the tone of the defendant's voice or the credibility of the government's and [defendant's] witnesses may legitimately lead a rational jury to find that this statement was a threat"; citing cases) (internal quotation marks and citations omitted); *United States v. Malik,* 16 F.3d 45, 49 (2d Cir.), *cert. denied,* 513 U.S. 968[, 115 S.Ct. 435, 130 L.Ed.2d 347] ... (1994); *United States v. Schneider,* 910 F.2d 1569, 1570 (7th Cir.1990).

*Id.* at 1031 (emphasis added). The court went on to caution, however, that

> [W]e deal here with a statement arguably ambiguous on its face. We leave for another day whether words which in their plain and surface meaning cannot be construed as threatening bodily harm may nonetheless support a conviction of threats under D.C.Code § 22–507 on the basis of the cited interpretive considerations.

*Id.* n. 6.

The case before us presents the question left open in *Clark.* The words "open the door" and "come out" are, in themselves, non-threatening. The difficult issue presented stems from the judge's finding that, less than three weeks earlier, Ms. Jenkins had, in effect, threatened to shoot Ms. Hunter. In the wake of that threat, the judge could reasonably find that what might otherwise have been a civilized "invitation" to come outside was, in context, something far less benign. The words, uttered in an angry manner and coupled with banging on and kicking the door, could be quite terrifying, and may well have been intended to terrify someone whose life had at least conditionally been threatened less than three weeks earlier, by the woman now challenging Ms. Hunter to come outside. Ms. Jenkins' ostensibly harmless words could and obviously did make Ms. Hunter apprehensive enough to refuse to open the door and to call 911 instead. Given the violent threat that she had recently received, her apprehension was hardly unreasonable.

In *Clark* we stated that the elements of a threat are "(1) that the defendant uttered words to another person; (2) that the words were of such a nature as to convey fear of serious bodily harm[10] to "the ordinary hearer"; and (3) that appellant intended to utter the words as a threat." 755 A.2d at 1030 (quoting *Baish,* 460 A.2d at 42). We must determine

---

**10.** In using the phrase "serious bodily harm"    in *Baish,* and in reiterating it in *Clark,* we did

whether, viewing the record as to the second and third elements in the light most favorable to the prosecution, a reasonable mind may fairly infer guilt beyond a reasonable doubt. *Clark*, 755 A.2d at 1030.[11] Although the case is not an easy one,[12] for Ms. Hunter was unable to recall a single word uttered by Ms. Jenkins on March 27 which was threatening on its face, we conclude that, in context, the evidence was sufficient.

## V.

## CONCLUSION

For the foregoing reasons, Ms. Jenkins' convictions are

Affirmed.

not necessarily mean that the threatened bodily harm had to be as serious as we have subsequently required it to be in aggravated assault cases. *See, e.g., Nixon v. United States*, 730 A.2d 145, 150 (D.C.1999).

11.  In its brief, the government asserts:

The language used in *Clark v. United States*, 755 A.2d 1026 (D.C.2000), and *United States v. Baish*, 460 A.2d 38 (D.C.1983), to describe the third element of threats— that the defendant intended to utter the words "as a threat"—does not comport with prior decisions of this [c]ourt. In *Campbell v. United States*, this [c]ourt correctly stated that the third element of the offense of threats to do bodily harm was "that the defendant *intended to utter the words which constituted the threat.*" 450 A.2d 428, 431 n. 5 (D.C.1982) (emphasis added) (citing *Gurley v. United States*, 308 A.2d 785, 787 (D.C.1973), and Criminal Jury Instructions for the District of Columbia, No. 4.17 (3rd ed. 1978)). *Evans*, a more recent case than *Clark* or *Baish*, cites to *Campbell* for the elements of threats. *Evans*, 779 A.2d at 894. Because *Campbell* predates *Clark* and *Baish*, *Campbell* controls. *See Thomas v. United States*, 731 A.2d 415, 420 n. 6 (D.C.1999) ("Where a division of this court fails to adhere to earlier controlling authority, we are required to follow the earlier decision rather than the later one."). Moreover, *Campbell's* articulation of this third element of threats is consistent with this [c]ourt's case law describing threats as a general intent crime. *See (James) Jones v. United States*, 477 A.2d 231, 239 n. 19 (D.C.1984).

Because, in our view, the evidence in this case was sufficient to establish the second and third elements, even under the *Baish–Clark* articulation, we do not address the conflict here perceived by the government—a conflict

which arguably might be more appropriately addressed by the court sitting en banc. Given the threat uttered by Ms. Jenkins on March 8, and the ample evidence from which the judge could reasonably infer that Ms. Jenkins' state of mind on March 27 was angry and irate, an impartial trier of fact, viewing the evidence in the light most favorable to the prosecution, could fairly find, beyond a reasonable doubt, that Ms. Jenkins' words, given content by her conduct, were intended to constitute a threat within the meaning of the statute.

12.  It is undisputed in this case that Ms. Jenkins lent Ms. Hunter her cell phone, that Ms. Hunter promised to pay for her calls, and that Ms. Hunter failed to do so. At the conclusion of the trial, Ms. Jenkins received a suspended sentence and was placed on probation. One condition of her probation was that she was not permitted to contact Ms. Hunter in person, by telephone, or electronically. Under these circumstances, recovery of the money Ms. Hunter owed her would doubtless be difficult, although Ms. Jenkins could presumably bring a "Small Claims" action without violating her probation.

The result of this case is somewhat troubling, for Ms. Jenkins' own testimony is not, on its face, unreasonable. Moreover, the judge explicitly disbelieved one of Ms. Jenkins' accusers, and she credited Ms. Hunter's allegation regarding the March 8 threat, in part, because a witness was present, even though that witness did not testify. Nevertheless, the case turns on the judge's credibility finding as between Ms. Hunter and Ms. Jenkins. The judge saw both women testify, and we are in no position to second-guess her assessment. The result we reach flows logically from the judge's virtually unreviewable determination as to which of the women was telling the truth.