*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 12-CM-2045 & 12-CM-2050

MYRON O NEAL GRAY, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CMD-8279-12 & CMD-9183-12)

(Hon. Yvonne Williams, Trial Judge)

(Submitted January 7, 2014            Decided September 25, 2014)
(Amended March 26, 2015)[*]

*Rose Mary Drake* was on the brief for appellant.

*Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman* and *Margaret E. Barr*, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and FISHER, *Associate Judges*, and RUIZ, *Senior Judge*.

RUIZ, *Senior Judge*: Gray appeals his convictions, after a bench trial, for

threats,[1] contempt,[2] and unlawful entry.[3] He contends that the trial court applied an

---

[*] This opinion is amended to delete the reference to *In re S.W.*, 45 A.3d 151, 155 (D.C. 2012) in footnote 8.

[1] D.C. Code § 22-407 (2012 Repl.).

[2] D.C. Code § 23-1329 (2012 Repl.).

[3] D.C. Code § 22-3302 (2012 Repl.).

incorrect legal standard in finding him guilty of threats and that the trial court erred in considering videos that were not formally admitted into evidence in finding him guilty of unlawful entry and contempt. We conclude that the trial court did not commit any error warranting reversal and affirm appellant's convictions.

## I.     Factual Background

The charges against appellant arose from incidents on May 12 and May 15, 2012, at his workplace, a Home Depot store on Rhode Island Avenue in Northeast Washington, D.C. Appellant's supervisor testified that because of appellant's "erratic" behavior in the store on May 11,[4] appellant was told to "go home" and that he would be called when he should return to work. Early the following morning, May 12, appellant returned to the store and made a hostile remark to a coworker. Later that day, when appellant returned to the store with his dog, he was arrested and charged with having threatened the coworker that morning. At that time, appellant was told that he was barred from returning to the Home Depot store. An order requiring appellant to stay away from the coworker and the Home Depot store and parking lot was issued on May 14. The following day, May 15, Home Depot store cameras recorded appellant entering and exiting the store and driving through the parking lot.

---

[4] Specifically, the supervisor testified that appellant threatened a coworker, wore sunglasses in the store after being told not to, and gave his supervisor "the finger."

The coworker, Jonathan Lowery, had worked with appellant for approximately five months, and he considered appellant a casual friend with whom he normally talked about "sports, boxing, and stuff like that." Lowery testified that on the morning of May 12,[5] appellant approached him and he "was threatening me, said he will kill me, I'll see you outside of work. He pointed his finger at me in my chest, I will kill you I see you outside of work." Lowery said that he was not scared by appellant's remarks but surprised, because they were "kind of random. I didn't understand the whole reason why he was so angry towards me." Lowery explained that he had had "no problems" with appellant in the past, and that appellant had no reason to threaten him.

Lowery said he thought appellant's behavior that day was "kind of strange, erratic. . . . [H]e seemed upset but it wasn't with me, it was with others. And he just seemed frustrated, I would say, pretty upset." Appellant spoke "calmly," Lowery testified, and seemed "impaired" because his eyes were "red, and they were jittery back and forth."[6] After appellant made these remarks, Lowery thought to himself, "yeah, whatever, and I walked away because I was in my workplace. I

---

[5] Lowery could not remember the date that appellant approached him, but testimony from Officer Fabian Ferrera, to whom the incident was reported, indicated that it happened on May 12.

[6] Lowery expressed uncertainty about whether appellant was actually impaired at the time, but was comfortable saying that he "appeared" impaired.

wanted to avoid confrontation, further confrontation." He added that he understood that "everybody has problems, you know, but the incident happened and I left it at that[.]"

Appellant testified in his defense. He admitted that he visited the Home Depot with his dog on May 12, but said that he did so as a customer rather than as an employee. He denied having any contact with Lowery that day. Appellant recounted that he was arrested at Home Depot on May 12, released on May 14, and then went to Providence Hospital later that evening, where he was admitted in the early hours of May 15.[7] He woke up on May 15 to learn that he would be transferred to Seton House and, not wanting to go there, appellant left Providence Hospital at 12:00 or 1:00 p.m. He said he was re-arrested later that day at Emory Recreation Center and taken to Seton House. Appellant denied that he visited Home Depot on May 15, and said that his rental car was in the store's parking lot that day because he had parked it there on May 12 and it was left in the parking lot when he was arrested. Appellant's mother also testified that she took her son to Providence Hospital at 9:00 p.m. on May 14, stayed overnight with him there, and then returned to Home Depot the next day to pick up appellant's rental car.

---

[7] The defense submitted appellant's patient card from Providence Hospital which indicated that he was admitted on May 15.

The judge explained her factual findings on the threats charge as follows:

> With respect to the threats count . . . I'll find [appellant] guilty. I understand that Mr. Lowery, maybe there's some—there's no reason for him to lie. He seemed to be a quite credible guy. He just said they were good friends and [appellant] made this threat toward him. . . . I don't know that Mr. Lowery necessar[ily] took it as a threat because I think he thought that [appellant] was having problems. But the standard is not what Mr. Lowery thought. I think it was what a reasonable person thought. Now, a reasonable person would assume that you say, I'm going to kill you, and then do a gun motion, that a reasonable person would take that as a threat. . . . I just don't see a reason for why he would come in here and lie when there's no reason. He's got a perfectly fine relationship with [appellant]. It just seems [appellant] was having whatever problems he was having that day and did what he did to Mr. Lowery. So I'll find [appellant] guilty on the threats count.

## II.    Threats

A person is guilty of the offense of threats under D.C. Code § 22-407 if he or she:  (1) uttered words to another person, (2) those words "were of such a nature as to convey fear of serious bodily harm or injury to the ordinary hearer," and (3) he or she "intended to utter the words that constitute the threat." *Carrell v. United States*, 80 A.3d 163, 171 (D.C. 2013) (quoting *Campbell v. United States*, 450 A.2d 428, 431 n.5 (D.C. 1982)).

Appellant claims that, in finding him guilty of threats, the trial court misapprehended the correct legal standard for the second element and, as a result, misunderstood the relevance of Lowery's testimony that he was not scared by appellant's words and disregarded Lowery's reaction.[8]

An analysis of the evidence necessarily begins with the words the speaker used, the first element of threats. Whether a speaker makes a threat, however,

---

[8] Appellant also argues that there was no evidence that he intended to utter the words as a threat, relying on the definition of the third element as set out in *Clark v. United States*, 755 A.2d 1026, 1030 (D.C. 2000). But that is not the governing standard. In *Carrell*, a case decided after appellant's trial and submission of the parties' briefs on appeal, we resolved a tension in our earlier decisions on the third element of threats. In some cases, we had said that a person must intend to utter the words *as a threat* to be guilty of the offense. *See, e.g.*, *Jenkins v. United States*, 902 A.2d 79, 86 (D.C. 2006); *Clark v. United States*, 755 A.2d 1026, 1030 (D.C. 2000); *United States v. Baish*, 460 A.2d 38, 42 (D.C. 1983). In others, we had said that a person need only intend to utter the words themselves, and need not also intend those words as a threat. *See, e.g.*, *Evans v. United States*, 779 A.2d 891, 894 (D.C. 2001); *Campbell v. United States*, 450 A.2d 428, 431 n.5 (D.C. 1982); *Postell v. United States*, 282 A.2d 551, 553 (D.C. 1971). In *Carrell*, we concluded that the "intent-to-utter" interpretation of the third element was the earlier holding of the court and therefore binding, *see Carrell*, 80 A.3d at 170 (citing *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971)), and that the court's en banc decision in *Holt v. United States*, 565 A.2d 970, 971-72 (D.C. 1989), held that the threats statute requires only a "general intent." *Id.* at 170-71. There is a petition for rehearing or rehearing en banc in *Carrell* pending before the court.

We also note that the Supreme Court has granted certiorari in *United States v. Elonis*, 730 F.3d 321 (3d Cir. 2013), *cert. granted*, 134 S. Ct. 2819 (2014), which presents the following questions: (1) whether proof of subjective intent to threaten is required by the First Amendment and *Virginia v. Black*, 538 U.S. 343 (2003), for conviction of threatening another person under 18 U.S.C. § 875 (c); and (2) whether as a matter of statutory interpretation, 18 U.S.C. § 875 (c) requires proof of defendant's subjective intent to threaten.

depends not simply on the words the speaker uttered; the speaker's words "must be considered in the context in which they were used." *In re S.W.*, 45 A.3d 151, 155 (D.C. 2012) (quoting *Jenkins*, 902 A.2d at 85); *see also Clark*, 755 A.2d at 1031. The factfinder's task in considering the second element of threats is to determine whether the speaker's words, taken in context, were "of such a nature as to convey fear of serious bodily harm or injury to the ordinary hearer." *Carrell*, 80 A.3d at 171 (quoting *Campbell*, 450 A.2d at 431 n.5). Thus, the words the speaker has uttered are "just the beginning" of a threats analysis. *In re S.W.*, 45 A.3d at 157.[9] In conducting this analysis, the factfinder must be guided by how an "ordinary hearer" would interpret those words taking into account the "full context in which the words are spoken." *Carrell*, 80 A.3d at 169.

Thus, the ordinary hearer[10] we posit is one aware of all the surrounding circumstances, including what the actual hearer knew. This is because the ordinary

---

[9] Similarly, words alone do not suffice for proof of threats "in a menacing manner" under § 22-404. *In re D.W.J., Jr.*, 293 A.2d 268, 269 (D.C. 1972).

[10] The law invokes the "ordinary hearer," rather than the actual target of a threat, to eliminate personal idiosyncrasies or biases. The target's idiosyncratic response tells us little about what the speaker actually did, which is the basis for criminal liability. The ordinary hearer, like the "reasonable person" used in establishing a number of legal standards, is free from personal idiosyncrasies or biases. *See, e.g.*, *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988) ("This 'reasonable person' standard also ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached."); *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 816 (D.C. 2011) ("An unusually susceptible person may not recover [for negligently inflicted

(continued . . .)

hearer, like the often-used "reasonable person," responds to a situation in view of the totality of the circumstances. *See, e.g.*, *Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("We have said before that the crucial test is whether, taking into account all the circumstances surrounding the encounter, the police conduct 'would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'") (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)); *1901 Wyoming Ave. Co-op Ass'n v. Lee*, 345 A.2d 456, 461 (D.C. 1975) ("Where the court is faced with an integrated agreement which contains ambiguous terms, the standard of interpretation is what a reasonable person in the position of the parties would have thought it meant. The presumption is that the reasonable person knows all the circumstances before and contemporaneous with the making of the integration."); *Brown v. United States*, 584 A.2d 537, 542 (D.C. 1990) ("What is sufficient provocation [to kill another in the heat of passion] has not been exactly defined and is probably incapable of exact definition, for it must vary with the myriad shifting circumstances of men's temper and quarrels. It is . . . therefore to be considered in view of all circumstances.") (quoting *Commonwealth v. Pease*, 69 A. 891, 892 (Pa. 1908)); *Sinai v. Pollinger Co.*, 498 A.2d 520, 530-31 (D.C. 1985) (endorsing jury instruction on the

---

(. . . continued)
emotional distress] if an ordinary person would not have suffered severe emotional disturbance."). Whether words are "of such a nature" as to be considered threats under the circumstances, in other words, is not dependent on whether the actual hearer or target is unduly sensitive or oblivious to harm.

"ordinary care" standard which said in part, "the standard is ordinary care under all the circumstances. Obviously, that's a relative concept. A reasonable person changes his conduct according to the circumstances . . ."). In sum, whether an ordinary hearer would understand words to be in the nature of a threat of serious bodily harm is a highly context-sensitive question.

It is well-established that the government need not prove that the actual hearer felt fear or intimidation. *See Postell v. United States*, 282 A.2d 551, 554 (D.C. 1971) ("We do not ask whether appellant succeeded in frightening these police officers, but whether under the circumstances the language used by appellant when heard by the ordinary person would be understood as being spoken not in jest, but as carrying the serious promise of bodily harm or death."). This does not mean, however, that the actual hearer's response is irrelevant, as the actual hearer may well be, and frequently is, a reasonable person. A showing that a reasonable person in a particular situation would have, e.g., been aware of a certain risk, can be evidence that an actual person in that same situation was aware of it as well. *See Thomas v. United States*, 557 A.2d 1296, 1300 (D.C. 1989). Similarly, evidence about an actual person's response to a situation is evidence, sometimes the best evidence available, of how a reasonable person would have responded under the circumstances. Where, as here, there is evidence that words, though facially threatening, did not in fact "convey fear of serious bodily harm or

injury" to the actual hearer, the factfinder should consider and evaluate the reasons given for that reaction as part of its inquiry into how an "ordinary hearer" informed of all the circumstances would have perceived the words.

In sum, in considering the second element of the offense of threats, the factfinder must weigh not just the words uttered, but also the complete context in which they were used. The context of an utterance includes "facial expression, tone, stress, posture, inflection, and like manifestations of the speaker." *Clark*, 755 A.2d at 1031. It also includes the factual circumstances in which the words were uttered, the relationship between the speaker and the hearer, and their shared knowledge and history.[11] The context of an utterance can turn words that would be innocuous in most contexts into a threat.[12] Similarly, context can make facially threatening words benign.[13] A person can be guilty of threats without causing the

---

[11] *See, e.g.*, *Carrell*, 80 A.3d at 164 (affirming threats conviction against speaker who said "I could kill you right now, I could fucking kill you" to a girlfriend he had physically abused both in the past and while making those statements); *Jenkins*, 902 A.2d at 81, 84-86 (affirming threats conviction when speaker told someone who owed him money that he would "peel your girl's head back" if he wasn't paid).

[12] *See, e.g.*, *Joiner v. United States*, 585 A.2d 176, 178-79 (D.C. 1991) ("I will remember this," "I will get you for this," and "I don't forget faces" are threats when expressed to witnesses to the speaker's crime during which he fired a weapon in their direction).

[13] *See, e.g.*, *Lewis v. United States*, No. 13-CM-321 Mem. Op. & J. at 4 - 6 (D.C. July 31, 2014) (reversing threats conviction where remark by handcuffed suspect that "he would have blown [officer's] god-damned head off" was an "expression of frustration" that could not have induced fear of bodily injury); *In re*

(continued . . .)

target of the threats to fear serious bodily harm or injury, just as a person whose words actually cause fear can be innocent of threats.[14] The actual hearer's response to the speaker's words and the actual hearer's reasons for that response are relevant because they could reveal important evidence about the context of the speaker's utterance, including the relationship between the speaker and the actual hearer, that explains why that response was (or was not) objectively reasonable under the circumstances.

We turn to apply these principles to the case at hand. Here, the trial court found appellant guilty of threats based on Lowery's testimony that Gray said "I'm going to kill you," and made "a gun motion" with his fingers. The trial court credited Lowery's testimony that appellant uttered those words, a finding that is amply supported by the record. Therefore, the first element of threats is satisfied.

---

(. . . continued)
*S.W.*, 45 A.3d at 155-60 (modified lyrics from a Lil Wayne song—"We will set this whole block on fire" and "we will set your house on fire"—did not express threats when sung to a neighbor with whom the speaker had a friendly relationship).

[14] *Compare Postell*, 282 A.2d at 554 ("We do not ask whether appellant succeeded in frightening these police officers, but whether under the circumstances the language used by appellant when heard by the ordinary person would be understood as being spoken not in jest, but as carrying the serious promise of bodily harm or death."), *with In re S.W.*, 45 A.3d at 160 ("Certainly, as the fresh victim of apparent arson, it can be expected that [the witness's] sensitivities would be heightened. But every statement that causes a hearer fear or painful memories is not a threat[.]").

These words are facially threatening. The court then needed to consider whether an ordinary hearer in Lowery's circumstances would have taken them at face value, i.e., as a "real" threat of serious bodily harm. As the trial court noted, Lowery did not "necessarily" take appellant's words as a threat, explaining that he had a casual and friendly relationship with appellant; that he had had "no problems" with appellant in the past; and that appellant had no reason to threaten him. He described appellant's statement as "strange, erratic" and "kind of random" because Lowery "didn't understand the whole reason why [appellant] was so angry towards" him. He said that appellant seemed "upset but it wasn't with me, it was with others." In describing appellant's demeanor, Lowery said appellant spoke calmly and appeared "impaired" because his eyes were "red" and "jittery." Lowery's reaction was to say, "yeah, whatever" and to walk away. He testified that he was not "scared" or "shaken" by appellant's words.

Evidence does not need to be all in favor of the prosecution in order to be sufficient to convict. Here, notwithstanding Lowery's reaction, there was sufficient evidence that appellant's words to Lowery, viewed in context, were "of such a nature as to convey fear of serious bodily harm or injury to the ordinary hearer." *Carrell*, 80 A.3d at 171. There was no evidence that appellant was joking; indeed, Lowery testified that appellant seemed "serious." The words were accompanied by appellant making "a gun motion" pointed at Lowery's chest.

There was evidence that appellant was told to go home the previous day because of "erratic" behavior which included threatening another coworker. Lowery's testimony that appellant appeared frustrated and upset, and that he walked away from appellant to avoid a "further confrontation" and reported the incident to his supervisor, suggest that even if Lowery did not feel personally threatened, he also did not dismiss the incident altogether. When the prosecutor asked whether Lowery thought appellant would act on the threat, Lowery answered "maybe, possibility," before the court prevented him from answering any further.[15] The evidence before the court, viewed as a whole, was sufficient to support a finding that appellant threatened Lowery.

Appellant argues that "in considering only what a reasonable person would believe if he heard appellant's words" to Lowery, the court misapplied the law by "not taking into consideration the relationship between the parties, the context in which [the incident] occurred" or the particular reaction of the alleged victim in the case." Specifically, appellant contends that the trial court "disregarded" Lowery's testimony that he was "not shaken or scared" and the reason Lowery gave for his reaction. If appellant were correct, there would be cause to reverse and remand the

---

[15] The court excluded relevant evidence in refusing to allow Lowery to answer the prosecutor when she asked whether Lowery thought appellant would act on the threat. But that ruling was invited by defense counsel's objection to the prosecutor's question as asking for a "speculative" response. Even if the ruling was erroneous, it did not constitute plain error because Lowery had already testified that he did not feel personally threatened.

case. *See Lihlakha v. United States*, 89 A.3d 479, 488-90 (D.C. 2014) (remanding because trial court "did not appear to recognize" the relevance of certain evidence); *Foster v. United States*, 699 A.2d 1113, 1115-16 (D.C. 1997) (recognizing sufficiency of evidence presented but reversing and remanding because evidence was "insufficient on the precise grounds apparently relied upon by the trial court"). That is not, however, how we read the record.

In reaching a verdict, the court made reference to the normally friendly workplace relationship between Lowery and appellant. Moreover, the trial court heard the defense argue in closing, without objection, that Lowery is a reasonable person and that his subjective response, viewed in context, was objectively reasonable. In rebuttal, the prosecutor responded that "[w]hether or not Mr. Lowery is a reasonable person," a number of witnesses testified that appellant "was acting erratically that day, that he was agitated, that he was angry, that he was walking big." On this record, we are confident that the trial court did consider the full context in which appellant's words were uttered, including the relationship between the two men and Lowery's subjective response. Because the evidence was sufficient to allow a reasonable factfinder to conclude beyond a reasonable doubt that appellant was guilty of the threats charge, we affirm that conviction.

### III. Unlawful Entry and Contempt

Appellant challenges the unlawful entry and contempt convictions on the ground that the trial court based its factual findings on store surveillance videos that were not formally authenticated and admitted into evidence. Specifically, appellant notes that the trial court studied the videos and made findings that the license plate, make, and color of a car shown on the video entering the Home Depot parking lot were "the same" as for a car that appellant had leased. Although the trial court could not identify the person on the videos as appellant, it relied on testimony from a store employee who also viewed the videos and who had known appellant as a coworker for over a year, that they showed appellant parking his car in the lot, entering the store, and then leaving the store shortly afterwards.

Immediately before trial, defense counsel notified the court that she had received surveillance videos from the government the previous afternoon, but had been unable to view them until that morning; counsel had not seen all of them when the case was first called.[16] After viewing the tapes, defense counsel announced that she was ready to proceed. Defense counsel objected when

---

[16] The prosecutor said that she received the videos late, and provided copies to defense counsel within an hour of receiving them. Another video was received the morning of trial, but after it was viewed by both counsel, they jointly determined that it was not relevant to the case.

government witnesses testified about other surveillance videos that neither the defense nor the government had seen prior to trial.[17]  Counsel, however, did not object when the government played the surveillance tapes at trial, or when the trial court mentioned them in announcing the verdict, even though these tapes were never formally admitted into evidence.

For these reasons, we review the trial court's decision to rely on these tapes for plain error.  "To prevail on a ground not presented to the trial court, the defendant must demonstrate plain error, which requires a showing both that the trial court's ruling was obviously wrong and that there has been a miscarriage of justice." *Foote v. United States*, 670 A.2d 366, 369 (D.C. 1996).

Basic principles of appellate review dictate that in deciding whether evidence is sufficient to support a conviction, appellate courts are limited to considering evidence in the trial court record.  *See* D.C. App. R. 10 (a) (limiting the record on appeal to the original papers and exhibits filed in Superior Court, the transcript of the proceedings, and a certified copy of the docket entries); *Fabrizio v. Anderson*, 62 A.2d 314, 315 (D.C. 1948) (reversing judgment because certain exhibits were not introduced into evidence).  An appellate court reviews the trial

---

[17]  The court struck all testimony about videos that the parties didn't have, ruling that, "whatever we have, we can show.  If there's testimony as to other videos, I'm not considering it."

court's rulings for legal error; appeal is not a second opportunity to present evidence that was not presented to the trial court. An appeals court cannot meaningfully conduct its review of the sufficiency of the evidence unless the record actually contains the evidence that the factfinder relied on. *See Fassett v. Delta Kappa Epsilon*, 807 F.2d 1150, 1165 (3d Cir. 1986) ("The only proper function of a court of appeals is to review the decision below on the basis of the record before the trial court.").

Some courts have recognized an exception to the general principle that appellate review is confined to the record at trial where the evidence was presented at trial, discussed by witnesses, and was treated by all parties as if it had been admitted. *See, e.g.*, *United States v. Barrett*, 111 F.3d 947, 951 (D.C. Cir. 1997) ("The exhibits were treated below, without objection, as if they were admitted into evidence; they are therefore deemed admitted."). Here, the government received the surveillance videos late, and the defense did not object to the trial court's ruling that the government could present the videos that defense counsel had viewed that morning. The government played the videos in court, and witnesses discussed them. Defense counsel cross-examined witnesses about the store's camera systems and the particular videos that purported to show appellant. The prosecutor and defense counsel referred to the videos in closing arguments. Defense counsel did not object to the trial court's reliance on the videos in announcing the verdict.

Under the circumstances, it was not plain error for the trial court to rely on the videos in reaching a verdict.[18]

We therefore affirm the judgment of conviction on all counts.

*So ordered.*

---

[18] The fact remains, however, that this court does not have the videos on which the trial court relied to identify appellant as the person who went to the Home Depot store in violation of the barring order. Both parties indicate that the videos have been lost. This court has an institutional interest in the maintenance of a complete record for purposes of appeal. We, therefore, emphasize the importance of preserving evidence until final disposition of a pending appeal.