*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CM-1219

GIRMA ABOYE, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CMD-3858-13)

(Hon. Robert E. Morin, Trial Judge)

(Argued January 28, 2015                     Decided August 6, 2015)

*Fletcher P. Thompson* for appellant.

*Kristina L. Ament*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Suzanne G. Curt*, *David Misler*, *Karen Seifert*, and *Derrick Williams*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and EASTERLY, *Associate Judges*, and KRAVITZ, *Associate Judge of the Superior Court of the District of Columbia*.[*]

---

[*] Sitting by designation pursuant to D.C. Code § 11-707(a) (2001).

GLICKMAN, *Associate Judge*:  Appellant Girma Aboye was convicted of making bias-related threats to do bodily harm after he confronted a gay couple with homophobic slurs and threatened to kill them with his dog.  On appeal, he makes two arguments: first, that the Bias-Related Crime Act does not apply to the offense of threats; and second, that there was insufficient evidence to convict him of that offense.  We reject both contentions and affirm appellant's conviction.

**I.**

The evidence presented at trial by the government may be summarized as follows.  In 2012-2013, Michael Eichler and Zachary Rosen were an engaged gay couple living in Adams Morgan with their dog, Nico.[1]  Appellant owned a store in the neighborhood and also had a dog, Tarzan, who was described at trial as a brindled pit bull mix.  The two dogs and their respective owners sometimes encountered each other while out walking; according to Eichler and Rosen, Tarzan usually was rather unsociable and even hostile to Nico.  On one encounter in the fall of 2012, though, Eichler perceived Tarzan as friendly and attempted to lead

---

[1] Although Nico's breed and other characteristics were not elicited at trial, it may be inferred, from testimony that she sat on her owner's lap, that Nico was a small dog.

Nico forward so that the two dogs could interact. Appellant, however, jerked Tarzan back and declared, "My dog doesn't like homosexuals. You are a homosexual, right?" Eichler affirmed that this was so, and appellant continued, "My dog doesn't like homosexuals; my dog doesn't like faggots."

A few months later, on the evening of March 11, 2013, Eichler, Rosen, and Nico happened to be sitting on the patio outside Chief Ike's Mambo Room in Adams Morgan, next door to appellant's store. Appellant came outside to speak with someone on the sidewalk a short distance away from Eichler and Rosen. While they could not hear the entire conversation, they did hear appellant use the word "faggot" several times and make statements such as, "Look at those faggots." Rosen turned to appellant and said, "You know we can hear you."

Appellant looked at Rosen and heatedly yelled, "Shut up you faggots[;] I'm going to kill you with my dog. I'm going to have my dog kill you."[2] Rosen testified that appellant's outburst made him feel unsafe. Eichler called 911 on his cell phone. As he did so, appellant went into his store and returned with his dog on

---

[2] Eichler and Rosen differed slightly as to the exact words that appellant used, but they distinctly remembered that appellant used the word "faggot" repeatedly and threatened to kill them with his dog. They both described appellant's demeanor as aggressive and loud.

a leash. Tarzan and Nico barked at each other. Appellant then walked Tarzan past Eichler, Rosen, and Nico and down the street, away from the area.

While appellant was gone, Metropolitan Police Department Officer Fred Fritts arrived in response to Eichler's 911 call. Upon appellant's return from walking his dog, Officer Fritts detained him for having threatened Eichler and Rosen. Called at trial to testify as a defense witness, Fritts confirmed that Rosen and Eichler told him that Tarzan (in contrast to his owner) "was not being aggressive,"[3] and from his own observation of the animal, Fritts described Tarzan as "[v]ery friendly" and "energetic but not threatening."[4]

Appellant eventually was charged with an enhanced misdemeanor offense, namely bias-related threats to do bodily harm in violation of D.C. Code §§ 22-407 and -3703 (2012 Repl.). After a bench trial, the judge, crediting Eichler and Rosen's account of the incident, found appellant guilty as charged.

---

[3] The government made no hearsay objection to this testimony.

[4] Appellant also testified at trial. He denied having talked to Eichler or Rosen before March 11, 2013, and denied speaking to them or referring derogatorily to them that evening. The trial court did not credit these denials.

## II.

A provision of the Bias-Related Crime Act, D.C. Code § 22-3703 (2012 Repl.), authorizes enhanced punishment for persons convicted of bias-related crimes. A "bias-related crime" is defined in § 22-3701 (1), *inter alia*, as "a designated act that demonstrates an accused's prejudice based on the actual or perceived . . . sexual orientation . . . of a victim of the subject designated act." A "designated act," in turn, is defined to mean

> a criminal act, including arson, assault, burglary, injury to property, kidnapping, manslaughter, murder, rape, robbery, theft, or unlawful entry, and attempting, aiding, abetting, advising, inciting, conniving, or conspiring to commit arson, assault, burglary, injury to property, kidnapping, manslaughter, murder, rape, robbery, theft, or unlawful entry.[5]

Because the offense of threats to do bodily harm is not one of the particularly enumerated crimes in this definition, appellant argues that it is not a "designated act" subject to enhanced punishment under the Bias-Related Crime Act.[6] The government rejoins that the use of the word "including" before the enumeration of

---

[5] D.C. Code § 22-3701 (2) (2012 Repl.).

[6] Appellant does not challenge the trial judge's finding that his alleged offense was bias-related in that it evinced his prejudice "based on the actual or perceived sexual orientation" of Eichler and Rosen.

particular offenses shows that the list is merely illustrative, not exhaustive, and that the term "designated act" means any criminal act under D.C. law. The trial judge agreed with the government—and so do we.

The question being one of statutory interpretation, our review is *de novo*.[7] We begin with the plain language of the statute, but if we find ambiguity, "our task is to search for an interpretation that makes sense of the statute and related laws as a whole."[8] In doing so, we may "turn to legislative history to ensure that our interpretation is consistent with legislative intent."[9]

Subsection (2) of D.C. Code § 22-3701 states that "designated act" means "a criminal act, *including*" any of the particular listed offenses. Whether the listing is illustrative or exhaustive thus turns on the meaning we attach to the word "including." The Bias-Related Crime Act itself does not define "including," but "[t]he participle *including* typically indicates a partial list."[10] And so as not to

---

[7] *Richardson v. United States*, 927 A.2d 1137, 1138 (D.C. 2007).

[8] *Id.* at 1139 (citing, *inter alia*, *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc)).

[9] *Id.*; *see also Peoples Drug Stores*, 470 A.2d at 754.

[10] *Include*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Fed. Land Bank v. Bismarck Lumber Co.* 314 U.S. 95, 100 (1941) ("[T]he term 'including' is

*(continued…)*

leave interpretation of the word to chance, another section of the D.C. Code decrees that "[f]or the purposes of any act or resolution of the Council of the District of Columbia, unless specifically provided otherwise: . . . . The words 'include' and 'including' mean 'includes, but not limited to' and 'including, but not limited to.'"[11] It is not "specifically provided otherwise" in the Bias-Related Crime Act. Thus, we are obliged to conclude from the plain language of the statute and the express direction in § 1-301.45 (10) that the definition of a "designated act" in § 22-3701 (2) encompasses any criminal act under District of Columbia law, including threats of bodily harm.

Appellant takes issue with this reasoning. If a "designated act" is no more nor less than "a criminal act," why, appellant asks, didn't the Council just say so? Why did the Council bother to invent an unnecessary synonym ("designated" as a

---

*(continued...)*
not one of all-embracing definition, but connotes simply an illustrative application of the general principle."); *Dong v. Smithsonian Inst.*, 125 F.3d 877, 880 (D.C. Cir. 1997) ("We recognize, of course, that the word 'includes' normally does not introduce an exhaustive list but merely sets out examples of some 'general principle.'") (quoting *Bismarck Lumber*); *Intercounty Constr. Corp. v. District of Columbia*, 443 A.2d 29, 33 (D.C. 1982) (Nebeker, J., dissenting) (noting the "multitude of cases which hold that the term 'include' is expansionary, and not limiting").

[11] D.C. Code § 1-301.45 (10) (2012 Repl.).

substitute for "criminal") and enumerate a list of particular qualifying offenses? Doesn't this signal that, in this instance, despite the rule of construction in D.C. Code § 1-301.45 (10), the Council actually intended the list following the word "including" to be exhaustive?

We do not think that it does. For three reasons, we are more inclined to chalk up the somewhat puzzling wording of the statute to the occasional vagaries of legislative draftsmanship when many hands are at work, than to any intent to limit the scope of the definition of a "designated act." First, as we have said, positing such an intent requires us to assume that the drafters of the statute employed the word "including" in an atypical manner, one at odds with the Council's own standard rule of construction. Second, there is no apparent selection principle at work in the Bias-Related Crime Act's broad list of enumerated offenses, and certainly no clear limitation to particular categories of offenses. The list includes misdemeanors as well as felonies; property crimes as well as crimes against the person; and attempts as well as completed offenses. The omission from such a listing of a crime like threats to do bodily injury, not to mention other serious offenses that can be committed as hate crimes (e.g., stalking, extortion), appears arbitrary and inexplicable if the list is not merely illustrative; it is difficult to fathom why the Council would have intended to exclude threats and

other candidate offenses from the coverage of a statute designed to combat hate crimes.

Third, all indications from the legislative history of the Bias-Related Crime Act are that the Council had no such intent. The Act was proposed in 1989 and became law in 1990.[12] In recommending the bill to the Council, the Committee on the Judiciary described it as an effort to "curb the proliferation" of "bias-related or 'hate' crimes" of all kinds, specifically including not only assaultive behavior, but also non-assaultive intimidating "activities like burning a cross in front of a black family's home [and] painting a swastika on a synagogue."[13] Criminal threats, in other words, were meant to be targeted. The Act was designed to apply, the Committee emphasized, "[i]rrespective of the basis of a bias-related crime," in order to "send a powerful message . . . that such insidious forms of hatred will not be tolerated in the District and will be treated seriously by law enforcement authorities."[14] Underscoring the immateriality of the particular type of offense to the Act's coverage of hate crimes, the Committee explained the terms "bias-related

---

[12] D.C. Law 8-121, 37 D.C. Reg. 27 (May 8, 1990).

[13] Comm. on the Judiciary, Rep. on Bill 8-168 at 2 (Oct. 18, 1989).

[14] *Id.*

crime" and "designated act" as referring simply to "a criminal act" without substantive qualification:

> [The definitional section of the Act] [d]efines "bias-related crime" as a criminal act which is based primarily upon race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation, or political affiliation. The section also defines "designated act" as a criminal act pursuant to D.C. Code.[15]

We have found no indication anywhere in the legislative history of the Bias-Related Crime Act that the Council meant to limit it to the particular criminal offenses listed as being "included" in the definition of a "designated act."

We conclude that the term "designated act" in D.C. Code § 22-3701 (2) means any criminal act recognized under D.C. law, including the offense of threats to do bodily harm.[16]

---

[15] The term "designated act" is defined the same way now as when the Committee explained it.

[16] Appellant asserts that our construction of the term "designated act" renders the statute unconstitutionally vague. We see no basis for this contention. The statute as we construe it provides fair warning that the punishment for any criminal act under D.C. law may be enhanced if the crime demonstrates the actor's prejudice based on the victim's actual or perceived sexual orientation or other protected characteristic specified in D.C. Code § 22-3701 (1). *See McNeely v. United States*, 874 A.2d 371, 381-82 (D.C. 2005).

## III.

Appellant also contends that the evidence was insufficient to convict him for threatening to kill Eichler and Rosen with his dog Tarzan. When reviewing the sufficiency of the evidence, we interpret the trial record in the light most favorable to the government and ask whether there is some probative evidence on each of the essential elements of the crime from which a reasonable person could fairly find guilt beyond a reasonable doubt.[17]

"A person is guilty of the offense of threats under D.C. Code § 22-407 if he or she: (1) uttered words to another person, (2) those words 'were of such a nature as to convey fear of serious bodily harm or injury to the ordinary hearer,' and (3) he or she 'intended to utter the words that constitute the threat.'"[18] An ordinary

---

[17] *See Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc).

[18] *Gray v. United States*, 100 A.3d 129, 133 (D.C. 2014) (internal citations and quotation marks omitted). In two respects not material to this appeal, there are unresolved conflicts in our cases as to the wording of the second and third of these elements. First, while some of our cases, such as *Gray*, have said an utterance must threaten "*serious* bodily harm or injury" to be criminally actionable, others of our cases have said an utterance need only threaten "bodily harm or injury" (without the adjective "serious"). *See, e.g.*, *Joiner-Die v. United States*, 899 A.2d 762, 764 (D.C. 2006).

Second, our cases have not been consistent with respect to the *mens rea* required to commit the offense. *See Carrell v. United States*, 80 A.3d 163 (2013).

*(continued…)*

hearer is "one aware of all the surrounding circumstances, including what the actual hearer knew."[19] Whether a particular statement constitutes a threat is a question of fact.[20] Especially because the answer to that question may turn on nuance and context, the determination of the trier of fact is entitled to substantial deference.[21]

Appellant argues that there was insufficient evidence at trial to establish the second element of the offense of threats because there was no evidence that his dog actually was dangerous. On the contrary, appellant argues, the only pertinent evidence at trial about Tarzan was his breed (part pit bull), Eichler and Rosen's admission that "the dog was not being aggressive," and Officer Fritts's testimony

---

*(continued...)*
On July 15, 2015, this court granted a petition for rehearing and vacated the decision and judgment of the panel in *Carrell*, in order to consider en banc whether the government must prove that the accused had a greater *mens rea* than stated in *Gray*, e.g., that the accused intended to utter the words *as* a threat. *Cf. Elonis v. United States*, 135 S.Ct. 2001 (2015).

Appellant's sufficiency argument does not implicate either of these issues, however.

[19] *Gray*, 100 A.3d at 134-35.

[20] *Clark v. United States*, 755 A.2d 1026, 1031 (D.C. 2000).

[21] *See Gray*, 100 A.3d at 133-36.

that Tarzan was friendly, energetic, and unthreatening. There was no evidence regarding the size, age, health, or physical characteristics of the dog.

The government responds, and we agree, that such details were unnecessary to prove appellant guilty of making a threat that would instill the requisite fear in the ordinary hearer. According to the evidence, appellant heatedly yelled menacing and homophobic slurs at Eichler and Rosen and threatened to kill them. He had a history of making antagonistic, homophobic remarks to these two men, and he did not appear to be joking when he threatened to sic his dog on them. Whatever that animal's precise physical characteristics, it was no miniature lap dog; and whatever its actual temperament and proclivities, appellant had told Eichler that Tarzan was hostile to homosexuals. An ordinary hearer in this situation reasonably could fear that Tarzan might become vicious and attack if directed by his master to do so.[22] And even if Tarzan was friendly and tame, appellant's death threat was not. Appellant's words and demeanor could cause a

---

[22] Rosen testified that, under the circumstances of the confrontation on the evening of March 11, he felt unsafe. We have appreciated that the victim's fear may be probative as to whether the utterance, in the circumstances, was such as to convey fear of bodily injury to the "ordinary hearer." *See id.* at 135 ("[E]vidence about an actual person's response to a situation is evidence, sometimes the best evidence available, of how a reasonable person would have responded under the circumstances.").

reasonable hearer to fear that appellant imperiled his physical safety even if appellant's dog did not.  We hold that the evidence adduced at trial was sufficient to support appellant's conviction.


*Affirmed.*