*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-431

LAMONT D. ROBERTS, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-14048-15)

(Hon. Juliet J. McKenna, Trial Judge)

(Argued May 1, 2019                    Decided September 26, 2019)

*Deborah A. Persico* for appellant. *Sydney J. Hoffman* also filed briefs for appellant.

*Elizabeth Gabriel*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Youli Lee*, and *Jessica Brooks*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, THOMPSON, and MCLEESE, *Associate Judges.*

Opinion for the court by *Associate Judge* MCLEESE.

Opinion concurring in part and dissenting in part by *Associate Judge* THOMPSON at page 40.

MCLEESE, *Associate Judge*:  Appellant Lamont Roberts was found guilty at

trial of stalking, threats, assault, and unlawful disclosure of sexual images.  Mr.

Roberts argues that his unlawful-disclosure convictions must be reversed due to instructional error and that his unlawful-disclosure and threats convictions were not supported by sufficient evidence. We hold that in one respect the jury was erroneously instructed on the elements of unlawful disclosure. On that basis, we vacate four of Mr. Roberts's unlawful-disclosure convictions but affirm the fifth, as to which the instructional error was harmless. We hold that there was sufficient evidence to support all of the unlawful-disclosure convictions, and we therefore remand for further proceedings as to the convictions vacated for instructional error. Finally, we affirm the threats convictions.

## I.

In pertinent part, the evidence at trial was as follows. Mr. Roberts and L.H. first met in 2013 and then became romantically involved. L.H. enjoyed the relationship at first. Over time, however, the relationship began to change. Mr. Roberts started to engage in controlling behavior. He stopped taking L.H. to social gatherings, told her not to wear certain clothing that might attract attention, and began to check in frequently on her whereabouts. When L.H. did not quickly return Mr. Roberts's calls or text messages, he would show up unannounced at her work or at the row house she shared with her mother and children and honk his car horn until

she came out.  Quite a few times, L.H. became so uncomfortable with and annoyed by Mr. Roberts's behavior that she broke up with him.  These breakups did not last for long.  Mr. Roberts would apologize and beg for L.H. to take him back and L.H., who loved Mr. Roberts and wanted him to change, would agree to get back together.

After a particularly uncomfortable altercation in December 2013, L.H. wanted to end the relationship with Mr. Roberts permanently and therefore obtained a civil protection order against him.  In July 2014, Mr. Roberts showed up at the parking lot at L.H.'s place of work.  As L.H. was getting into her car, Mr. Roberts pulled in, and the two argued through their car windows.  When L.H. pulled out of the parking lot, Mr. Roberts followed her and eventually pulled up alongside her.  The two had a heated exchange that ended with Mr. Roberts throwing a soda can from his car into the open driver's side window of L.H.'s car before speeding off.  Although L.H. reported this incident to the police, she also decided shortly thereafter to get back together with Mr. Roberts.

Later in July 2014, after L.H. and Mr. Roberts had resumed their relationship, Mr. Roberts pulled up in front of L.H.'s home while L.H. was sitting in a car with a male family friend.  Mr. Roberts asked L.H. to get out of the car, saying that the two of them needed to talk.  When L.H. refused, Mr. Roberts retrieved a baseball bat

from his trunk and told L.H., "You're going to get out of the car.  Bitch, you think this is a joke, you're going to get out of the car."  L.H. still did not get out of the car and her mother, who had heard the commotion and had come out of the house, called the police.  Mr. Roberts appeared to be so mad when he approached the car with the bat that L.H.'s mother feared that he would have done "terrible bodily damage" to L.H. had L.H.'s family friend let Mr. Roberts open the car door.

L.H. continued to be romantically involved with Mr. Roberts for some time after this incident, but by May or June 2015 she decided to end the relationship for good.  At first, Mr. Roberts did not appear to take the breakup seriously and engaged in the same sort of calling, apologizing, and randomly showing up at L.H.'s home that he had engaged in during the couple's previous breakups.  After Mr. Roberts saw L.H. arrive home with another man, however, Mr. Roberts's behavior changed.  Mr. Roberts started calling and texting L.H. more frequently, sometimes as many as 150 to 200 times a day.  He also sent her text messages and emails, and left her voicemails, with angry and aggressive language.

On August 22, 2015, Mr. Roberts left L.H. a voicemail in which he stated: "When I see you baby, I'm a try to kill you Bitch.  You gonna sleep with another n**a, don't talk to nobody else.  You the only girl I love, watch when I see you."

(This communication was the basis for the first threats count.) On August 28, 2015, Mr. Roberts left L.H. another voicemail:

> So fuck me, right, so fuck me and you with another fucking n**a, I'm-a tell you . . . , you better have all my money, the purse and all of that. I'm going to make your life a living fucking hell. Watch man. I went and got your name on me about 8 times, thinking you with another n**a. You going to answer, watch.

(This communication was the basis for the second threats count.) On October 3, 2015, Mr. Roberts sent L.H. an email that read: "So u have been to party with him rite I'll see u tomorrow bitch die with your mother and kids." (This communication was the basis for the third threats count.)

Around this same time period, Mr. Roberts began telling L.H. that he was going to post nude photos that he had taken of her with his phone during their relationship. L.H. described the photos as follows. The first photo was a close-up of L.H.'s vagina. The second was of L.H. from behind while she was lying on her stomach across a bed with her legs crossed. The third was from the same angle as the second but without L.H.'s legs crossed and with her vagina visible. (It is unclear whether, in describing the photos, L.H. was using the term "vagina" in its precise anatomical sense or more colloquially to refer to the vulva.)

Although L.H. had been aware that Mr. Roberts had taken the photos, she had told him to delete them immediately after they were taken and believed that she had seen him do so. L.H. only learned that Mr. Roberts had not in fact deleted the photos when he included them as attachments to numerous text messages and emails he sent her in September and October 2015.

On the morning of October 3, 2015, L.H. received an email from Mr. Roberts which said, "Enjoy it on bitch[.]" A short time later, L.H.'s mother heard a knock at the front door. When she opened the door, she found a sexually explicit photo of L.H. taped to the door. L.H.'s mother removed the photo from the door and gave it to L.H., who in turn gave it to the police. L.H. identified the photo as being one of the photos that Mr. Roberts took of her from behind while she was nude. (This incident was the basis for the first unlawful-disclosure count.)

On the following day, L.H. went to a laundromat near her home to do laundry. After bending down to transfer clothes from the washing machine to the dryer, L.H. looked up to find Mr. Roberts standing over her. L.H. told Mr. Roberts to leave and warned him that he could not do anything to her in the laundromat where other people were present. After Mr. Roberts left, L.H. went out to the parking lot and found an explicit picture of herself -- which she identified as "the butt one" -- on the

windshield of her car. The picture had L.H.'s name written on it. She immediately took the picture off the window, and as she did so she saw Mr. Roberts sitting in his car in the parking lot. L.H. yelled at Mr. Roberts and took pictures of him with her phone as he rolled down his window, laughed at her, and waved a stack of extra copies of the explicit images he had taken of her. L.H. testified that she was yelling and hysterical during this interaction and that people other than her and Mr. Roberts were watching. L.H. told Mr. Roberts that she was calling the police and then did so. A police officer arrived about ten minutes later, by which time Mr. Roberts had left. The incident left L.H. angry and in tears. (This incident was the basis for the second unlawful-disclosure count.)

The police officer stayed with L.H. for about fifteen minutes, until L.H. was nearly done with her laundry, and then left. A few minutes later, L.H. left the laundromat and saw Mr. Roberts drive up in his car as she pulled out. Mr. Roberts made a U-turn and began to follow L.H. When L.H. stopped at a traffic light, Mr. Roberts pulled up alongside her and held a stack of explicit photos of her out of his open driver-side window. L.H. took pictures of Mr. Roberts as he did this. There were other cars around, and the light at which L.H. and Mr. Roberts were stopped was right next to the shopping center where the laundromat was located. When the

light turned green, Mr. Roberts drove off.  (This incident was the basis for the third unlawful-disclosure count.)

The following evening, on October 5, 2015, L.H. received an email from Mr. Roberts which said, "Bring my stuff outside or get pic off pole."  One of the explicit photos of L.H. was attached to the email.  L.H. looked outside and saw that a piece of paper was folded and tucked into her front gate.  L.H.'s gate, which is about twenty feet from her front door, opens onto the sidewalk of the residential street where she lives.  The piece of paper was stuck in the gate in the same way that someone might place a "carry-out flyer," and was accessible to anyone walking by.  L.H. retrieved the piece of paper, saw that it was an explicit photo of her, took it inside her house, tore it up before her children could see it, and then called the police.  (This incident was the basis for the fourth unlawful-disclosure count.)

Two days later, on October 7, 2015, at around 8 a.m., L.H. was leaving her house to take her children to school when she noticed a white sheet of paper on the windshield of her car.  L.H. told her children to go back into the house and then crossed the street to where her car was parked.  After recognizing that the paper on the windshield was an explicit image of her, she took a photo of how the image was placed on her car and then removed the image and saved it.  L.H. testified that she

had last seen her car the preceding night and that she was not sure when the image had been placed on the windshield. A police officer who patrols L.H.'s neighborhood testified that traffic is "very heavy" on L.H.'s street during the morning commute from as early as 6 a.m. onward. (This incident was the basis for the fifth unlawful-disclosure count.)

## II.

We turn first to Mr. Roberts's challenges to the jury instruction defining the elements of unlawful disclosure. Mr. Roberts raises two objections: that the instruction erroneously defined the term "disclose" and that the instruction failed to state that any disclosure had to be to someone other than L.H. We agree with Mr. Roberts's second claim of error but not his first. We further conclude that the error requires vacation of four of Mr. Roberts's five unlawful-disclosure convictions.

## A.

The unlawful-disclosure statute, D.C. Code § 22-3052 (2019 Supp.), provides in pertinent part that

> (a) It shall be unlawful in the District of Columbia for a person to knowingly disclose one or more sexual images of another identified or identifiable person when:
>
> (1) The person depicted did not consent to the disclosure of the sexual image;
>
> (2) There was an agreement or understanding between the person depicted and the person disclosing that the sexual image would not be disclosed; and
>
> (3) The person disclosed the sexual image with the intent to harm the person depicted or to receive financial gain.

The term "disclose" is defined to mean "transfer or exhibit to 5 or fewer persons."

D.C. Code § 22-3051(1) (2019 Supp.).

The trial court in this case instructed the jury as follows with regard to the elements of unlawful disclosure:

> The elements of unlawful disclosure of a sexual image, each of which the government must prove beyond a reasonable doubt are that; one, Lamont Roberts exhibited a sexual image of [L.H.]; two, Lamont Roberts exhibited the sexual image to another person or exhibited the sexual image in a place where it is viewable to another person; three, he did so voluntarily and on purpose, not by mistake or accident; four, [L.H.] was identified or identifiable in the sexual image; five, the sexual image did not result from [L.H.'s] voluntary exposure in a public or commercial setting; six, [L.H.] did not consent to the exhibition; seven, there was an understanding between [L.H.] and Lamont Roberts that the sexual image would not be exhibited; and eight, when [] Lamont Roberts exhibited the sexual image, he did so with the intent to harm [L.H.] . . . . The term

"disclosure" means transferring or exhibiting to five or fewer people.

Assessing Mr. Roberts's claims of instructional error requires us to interpret the unlawful-disclosure statute. We decide issues of statutory interpretation de novo. *Facebook, Inc. v. Wint*, 199 A.3d 625, 628 (D.C. 2019). "We first look to see whether the statutory language at issue is plain and admits of no more than one meaning." *Id.* (internal quotation marks omitted). "We will give effect to the plain meaning of a statute when the language is unambiguous and does not produce an absurd result." *Id.* (internal quotation marks omitted). We consider statutory context and structure, evident legislative purpose, and the potential consequences of adopting a given interpretation. *E.g.*, *J.P. v. District of Columbia*, 189 A.3d 212, 219 (D.C. 2018). "We may also look to the legislative history to ensure that our interpretation is consistent with legislative intent." *Facebook*, 199 A.3d at 628 (brackets and internal quotation marks omitted).

Whether a challenged jury instruction was correct is a question of law that we decide de novo. *Buskey v. United States*, 148 A.3d 1193, 1205 (D.C. 2016). Misinstruction on an element of an offense violates the Sixth Amendment jury-trial guarantee. *Carrell v. United States*, 165 A.3d 314, 327 n.33 (D.C. 2017) (en banc).

Such an error therefore requires reversal unless we can determine that the error was harmless beyond a reasonable doubt. *Id.* at 328.

**B.**

Mr. Roberts first objects to the instruction that unlawful disclosure includes exhibition of a sexual image "in a place where it is viewable to another person." We find no error in this instruction.

The unlawful-disclosure statute defines "disclose" as "to transfer or exhibit to 5 or fewer persons." D.C. Code § 22-3051(1). Although the jury instruction in this case referred at one point to "transferring," the instruction stated the elements of the offense as requiring that the sexual images at issue have been "exhibited." The United States also relied at trial solely on the theory that the images had been exhibited. We therefore focus in this opinion primarily on the term "exhibit."

In interpreting statutory text, we generally "give the words used the meaning ordinarily attributed to them." *Coleman v. United States*, 202 A.3d 1127, 1138 (D.C. 2019) (internal quotation marks omitted). Because the unlawful-disclosure statute does not further define "exhibit," we look to dictionary definitions to help determine

that word's ordinary meaning. *1618 Twenty-First St. Tenants' Ass'n v. Phillips Collection*, 829 A.2d 201, 203 (D.C. 2003). A standard definition of the verb "exhibit" is "to present to view: SHOW, DISPLAY." *E.g.*, *Webster's Third New International Dictionary* 796 (2002). That definition can be understood to suggest that a person who places an image so that it could be seen by others has "exhibited" the image, even if as things turn out no one actually sees the image. *Cf. State v. Johnson*, 964 S.W.2d 465, 468-69 (Mo. Ct. App. 1998) (defendant "exhibited" weapon by making "open and visible use" of weapon, even though no one else saw weapon); *State v. Carter*, 681 S.W.2d 587, 589 (Tenn. Crim. App. 1984) ("The defendant's open and visible use of the blackjack was a display of the weapon, regardless of whether the victim or any of the witnesses saw it. The weapon was there to be seen had anyone happened to look in that direction.").

We do not, however, view the standard definition of "exhibit" to be by itself dispositive. We must consider that word in context. The disclosure statute defines "disclose" as including "exhibit *to 5 or fewer persons.*" D.C. Code § 22-3051(1) (emphasis added). The prepositional phrase "to 5 or fewer persons" at least arguably could be understood to suggest that some specific person or persons must actually have seen the image at issue. *Cf. Home Loan Servs., Inc. v. Moskowitz*, 920 N.Y.S.2d 569, 570 (App. Div. 2011) (per curiam) (nailing notice to quit on door of property

did not suffice to meet statutory requirement that notice be "exhibited to" occupant). On the other hand, one could reasonably interpret this language as requiring only that the image at issue have been made viewable to at least one person, even if that person did not actually see the image. (We note that we accept for purposes of this opinion the parties' agreement that the statute requires disclosure to at least one person other than the defendant and the person depicted in the image at issue; we also note that there is no dispute in this case as to the mens rea requirements of the unlawful-disclosure statute, and we therefore have no occasion to address those requirements.)

Because the phrase "exhibit to" in isolation does not resolve our inquiry, we turn to other relevant considerations. We initially consider three other contextual indications as to the meaning of "exhibit to." First, as previously noted, the disclosure statute also defines "disclose" to include "transfer." A standard definition of "transfer" is "to carry or take from one person or place to another." *Webster's Third New International Dictionary* 2426-27. *Cf., e.g.*, *Long v. United States*, 623 A.2d 1144, 1147 (D.C. 1993) (for purposes of statute prohibiting distribution of controlled substances, "transfer" means "to carry or take from one person or place to another") (internal quotation marks omitted). Thus, a defendant can violate the unlawful-disclosure statute by transferring possession of a sexual image to a third

party, and when that is done the offense is complete before the third party views the image and even if the third party never does actually view the image. That being so, one could reasonably think that "exhibit to" should be interpreted similarly, to reach conduct that creates a risk that a third party would view the image but that has not caused actual viewing to occur.

Second, we look to the ordinary meaning of the defined term "disclose." *Cf. generally, e.g.*, *Leocal v. Ashcroft*, 543 U.S. 1, 11 (2004) (in interpreting provisions defining "crime of violence," courts "cannot forget that we ultimately are determining the meaning of the term 'crime of violence'"); *Porter v. Harden*, 891 N.W.2d 420, 427 (Iowa 2017) ("[W]hen the legislative definition of a term itself contains ambiguity, we should hesitate before veering too far from the common meaning of that term."). Standard definitions of "disclose" include "to expose to view" and "to make known." *Webster's Third New International Dictionary* 645. The first of these definitions points in favor of imposing liability under the unlawful-disclosure statute where a defendant places an image in public view, even if no one can be proven to have actually seen the image. *See Senne v. Village of Palatine, Ill.*, 695 F.3d 597, 601-03 (7th Cir. 2012) (en banc) (police officer "disclose[d]" personal information, within meaning of 18 U.S.C. § 2721(a) (2012), by placing parking ticket containing personal information on windshield of parked car "in plain view

on a public way," "regardless of whether another person viewed the information"). The latter definition, though, arguably tends to suggests that someone has to actually become aware of the image. Thus, the term "disclose" by itself also is not dispositive.

Third, we consider the broader statutory context. Unlawful disclosure is one of three offenses created by the Criminalization of Non-Consensual Pornography Act of 2014, D.C. Law 20-275, 62 D.C. Reg. 6646 (May 22, 2015) (now codified as D.C. Code § 22-3051 et seq. (2019 Supp.)). The other two offenses are first-degree unlawful publication, D.C. Code § 22-3053, which is a felony, and second-degree unlawful publication, D.C. Code § 22-3054, which is a misdemeanor. For current purposes, the key difference between unlawful publication and unlawful disclosure turns on the meaning of "publish." Under the unlawful-publication statute, "publish" is defined as "to transfer or exhibit to 6 or more persons, or to make available for viewing by uploading to the Internet." D.C. Code § 22-3051(5). That definition also seems to point against interpreting "exhibit to" to require actual viewing, because violation of the unlawful-publication statute does not require proof that anyone actually viewed the image at issue. If an image is uploaded to the Internet, the offense is complete even if the image is removed from the Internet

before anyone actually views the image. That being so, it would seem incongruous with the overall statutory scheme to interpret "exhibit to" to require actual viewing.

We next turn to the legislative history of the Act. The Committee Report discusses an illuminating hypothetical example, in which an ex-boyfriend tapes a sexual photo of his ex-girlfriend to the front door of the elementary school where she is a teacher. D.C. Council, Report on Bill 20-903 at 5-6 (Nov. 12, 2014). The Report explains that the offense of felony publication "would be complete upon the taping of the photo on the door where many people could view it. It would not matter if the school janitor saw the photograph and removed it before others saw it." *Id.* As noted above, "publish" is defined as "to transfer or exhibit to 6 or more persons, or to make available for viewing by uploading to the Internet." D.C. Code § 22-3051(5). The example in the Committee Report clearly does not involve uploading to the Internet. The example also does not involve a transfer to more than six people. Thus, the example must be an instance of exhibiting to six or more persons, which indicates that the Council did not view the phrase "exhibit to" as requiring that an image be actually viewed by each person to whom an image is made available for viewing.

Finally, we turn to considerations of statutory purpose and the consequences of the competing interpretations. Mr. Roberts used sexual images of L.H. to coerce and frighten L.H., leaving L.H. understandably angered and deeply upset. Mr. Roberts's conduct thus went directly to interests the Act was intended to protect. *See, e.g.*, Report on Bill 20-903 at 3 (citing testimony that "non-consensual pornography is used as a weapon to shame, embarrass, degrade, control, and punish") (internal quotation marks omitted). We think it unlikely that the Council intended to permit such conduct under the disclosure statute as long as no one (other than the defendant and the person depicted in the image) ended up seeing the images.

Taken as a whole, the foregoing considerations lead us to conclude that the trial court correctly refused to instruct the jury that the unlawful-disclosure statute (and more specifically "exhibit[ing] to" under the disclosure statute) requires proof that someone other the defendant and the person depicted actually viewed the sexual image at issue.

We are not persuaded by Mr. Roberts's arguments to the contrary. First, Mr. Roberts points out that the Committee Report's examples of violations of the unlawful-disclosure statute involve instances in which a third party actually viewed a sexual image. The Report explains, however, that the examples in the Report are

not intended to be exhaustive.  Report on Bill 20-903 at 4 n.16 ("Please note that all hypotheticals provided in this report are for explanatory purposes only and should not be construed as an exhaustive example of all the ways in which the elements of the offenses created by Bill 20-903 may be satisfied.").  *See also, e.g.*, *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 115 (1988) ("It is not the law that a statute can have no effects which are not explicitly mentioned in its legislative history . . . .").

Second, Mr. Roberts argues that if "exhibit to" includes making images available for viewing, then the language about uploading to the Internet in the unlawful-publication statute is surplusage, because it would already have been clear that uploading images to the Internet makes the pictures available for viewing.  We disagree.  Including the language about the Internet in the unlawful-publication statute makes explicit something that otherwise would not necessarily have been entirely clear:  that uploading images to the Internet violates the unlawful-publication statute, and thus is potentially a felony, without the need for a case-specific inquiry into the number of people to whom the images were made available for viewing.

Finally, although Mr. Roberts does not invoke the rule of lenity, we have considered that rule.  "The rule of lenity . . . is a secondary canon of construction,

and is to be invoked only where the statutory language, structure, purpose, and history leave the intent of the legislature in genuine doubt." *J.P.*, 189 A.3d at 222 (internal quotation marks omitted). For the reasons we have explained, the rule of lenity does not tip the balance in this case.

In sum, we hold that unlawful disclosure can include making a sexual image available for viewing even if the image is not actually viewed by anyone other than the defendant and the person depicted in the image. The trial court's instruction on this point was therefore not erroneous.

## C.

Mr. Roberts's second objection is that the unlawful-disclosure instruction did not make clear that the unlawful-disclosure statute requires that the defendant have disclosed the sexual image at issue to a person other than the person depicted in the image. The United States agrees that a defendant must have disclosed a sexual image to a third party to violate the unlawful-disclosure statute but argues that the jury instructions did not suggest otherwise. We agree with Mr. Roberts.

Assuming without deciding that the unlawful-disclosure statute would be violated only by disclosure to someone other than L.H., we find that the jury instructions did not adequately convey that principle. When reviewing a claim of instructional error, we examine the instructions "in their entirety." *Buskey*, 148 A.3d at 1205-06 (internal quotation marks omitted). By way of background, the unlawful-disclosure instruction was initially proposed by the United States, which at the time took the position that disclosure solely to L.H. was sufficient to prove that Mr. Roberts had violated the unlawful-disclosure statute. Mr. Roberts's counsel objected to the instruction in part on the ground that it suggested that disclosure solely to L.H. would suffice. The trial court overruled that objection, stating that it did not think that violation of the unlawful-disclosure statute required that the images have been shown to a third person. The unlawful-disclosure instruction thus apparently was drafted to permit the jury to find guilt if the images at issue were exhibited only to L.H.

In our view, that is also the most natural reading of the part of the jury instructions focused most directly on this issue. That passage stated, "two, Lamont Roberts exhibited the sexual image to another person or exhibited the sexual image in a place where it is viewable to another person." A juror could quite reasonably

conclude that "another person" in that passage meant "a person other than Mr. Roberts," who was the only person named in the passage.

As the United States notes, however, we must consider the instructions as a whole. The United States points out that L.H. was mentioned by name in other parts of the unlawful-disclosure instruction. Therefore, the United States argues, the jury would naturally have inferred that "another person" in the second element of the unlawful-disclosure instruction meant "someone other than Mr. Roberts or L.H.," who were the two people named in the unlawful-disclosure instruction as a whole. That interpretation is possible, but we have no particular reason to suppose that the jury adopted it. To the contrary, we think the more likely outcome is that the jury would have given this instruction the meaning that was apparently intended: that "another person" meant someone other than Mr. Roberts, the person whose name was most proximate to "another person" in the instruction on this particular element. *Cf., e.g.*, *Cherry v. District of Columbia*, 164 A.3d 922, 926 (D.C. 2017) ("[O]rdinarily, qualifying phrases are to be applied to the words or phrase immediately preceding and are not to be construed as extending to others more remote.") (internal quotation marks omitted). We therefore conclude that the instruction on this point was erroneous.

**D.**

We next consider whether the error was harmless beyond a reasonable doubt. *Carrell*, 165 A.3d at 328. We conclude that, as to all but one of the unlawful-disclosure counts, the United States has failed to establish that the error was harmless beyond a reasonable doubt.

Mr. Roberts was convicted of five counts of unlawful disclosure: Count 7 (the image taped to L.H.'s door and discovered by L.H.'s mother); Count 8 (the image placed on L.H.'s car at the laundromat); Count 9 (the image held up out of Mr. Roberts's car window at the traffic light); Count 10 (the image folded and placed in L.H.'s gate); and Count 11 (the image placed on L.H.'s car outside her home).

We find that the instructional error was harmless for Count 7. L.H.'s mother testified that she saw the sexual image of L.H. taped to the front door, and that testimony was not meaningfully disputed at trial. We are confident beyond a reasonable doubt that the jury's guilty verdict on Count 7 did not rest on the theory that the image at issue was exhibited only to L.H.

The same cannot be said of the remaining counts. As discussed in greater detail *infra*, the evidence presented on the remaining counts would permit a reasonable jury to conclude that the images at issue in those counts were made available for viewing by persons other than L.H. The evidence on that point, however, was far from overwhelming. Although L.H. noted the presence of bystanders and the public nature of some of the areas where the images were shown, no witness other than L.H. testified to having seen these images or to having been in a position to do so. Conversely, there was overwhelming evidence that the images were exhibited to L.H. Moreover, the United States's closing argument was at best ambiguous as to whether a conviction for unlawful disclosure could rest on exhibiting images only to L.H. The United States did not explicitly disavow that theory to the jury, which is unsurprising given that the United States had successfully advocated the theory to the judge only minutes before. The United States did refer to the public nature of several of the incidents, but also used language that in isolation seemed to imply that disclosure to L.H. would suffice: "We have to show you that the defendant exhibit[ed] the image to another person or in a place that is viewable to another person. Her front door. Her gate. Her windshield."

We note in particular that the jury instructions required the jury to find beyond a reasonable doubt that Mr. Roberts exhibited the images at issue to another person

"on purpose." The jury was not told that "another person" could not include L.H., and the jury could reasonably have believed that it sufficed that Mr. Roberts intended to make the images viewable to L.H. There was evidence that would have permitted the jury to infer that Mr. Roberts also intended to make the images viewable to others, but that evidence too was not overwhelming. L.H. testified that the photo left in the gate was tucked and folded and "not . . . visible"; there was no explicit testimony that the photo left on L.H.'s car windshield when her car was in the laundromat had been placed on the windshield face up; there was no specific evidence that Mr. Roberts would have been aware that nearby pedestrians or drivers were close enough that they could have seen the photo that appellant briefly held outside his driver's side window and that L.H. could see from her car that was stopped alongside appellant's car; and there was no evidence as to how long the photo left on L.H.'s windshield near her house had been there or whether appellant would have had specific reason to expect that someone other than L.H. would see the photo before L.H. retrieved the photo. In our view, the jury could have had a reasonable doubt as to whether Mr. Roberts intended to make the images at issue in the remaining counts viewable to persons other than L.H. Under the circumstances, we cannot say beyond a reasonable doubt that the jury's verdict on the remaining counts would have been the same had the jury been instructed that disclosure had to be to a person other than L.H.

This error cannot be rectified, as the United States suggests, by remanding the remaining unlawful-disclosure counts for entry of judgment on the lesser-included offense of attempted unlawful disclosure. Given the nature of the instructional error, it is not clear beyond a reasonable doubt that the jury would have found that Mr. Roberts *attempted* to exhibit the images at issue to anyone other than L.H. Remanding for entry of judgment on the attempted offense would thus be unwarranted. We therefore vacate Mr. Roberts's convictions on counts 8-11.

## III.

Mr. Roberts contends there was insufficient evidence to support his convictions for unlawful disclosure. We disagree.

## A.

When assessing the sufficiency of the evidence, we "view the evidence in the light most favorable to the verdict, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Miller v. United States*, 209 A.3d 75, 77 (D.C. 2019) (brackets and internal quotation

marks omitted). "The evidence is sufficient if, after viewing it in the light most favorable to the verdict, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (brackets and internal quotation marks omitted). Even where a conviction is vacated on other grounds, we consider challenges to the sufficiency of the evidence, to ensure that retrial is not barred by the Double Jeopardy Clause. *Hobbs v. United States*, 18 A.3d 796, 802 (D.C. 2011).

**B.**

In part, Mr. Roberts's sufficiency arguments rest on his contentions regarding the proper interpretation of the unlawful-disclosure statute. To the extent that Mr. Roberts argues that there was insufficient evidence that some of the images were actually viewed by someone other than L.H., that argument is foreclosed by our holding earlier in this opinion that unlawful disclosure can include making an image available for viewing. *Supra* at 12-20. The key question is thus whether there was sufficient evidence at trial for the jury to conclude that Mr. Roberts made the images available for viewing by people other than L.H. We conclude the evidence on this point was sufficient on all of the unlawful-disclosure counts.

With regard to Count 7, Mr. Roberts acknowledges L.H.'s mother's testimony that she saw the sexual image of her daughter taped to the door. A reasonable juror could find that in this incident Mr. Roberts made a sexual image available for viewing by L.H.'s mother.

For Count 8, L.H. testified that there were other people at the laundromat when she found the explicit image on her car in the parking lot; that other cars were parked in the parking lot; and that people outside the laundromat were watching as she confronted Mr. Roberts and took photos of him while he laughed and held a stack of explicit images of her out of his car window. The police officer who responded to the scene corroborated L.H.'s testimony, stating that there were at least five cars in the parking lot and at least ten people inside the laundromat. A reasonable juror could find that in this incident Mr. Roberts made a sexual image available for viewing to a number of bystanders.

For Count 9, L.H. testified that the intersection where Mr. Roberts held the explicit image of her out of his car window was near to the shopping center where the laundromat was located. She stated that there were cars stopped behind her and Mr. Roberts and other cars passing through the intersection. L.H. also took photos of Mr. Roberts while he held the images of her out of his window, and those photos

were admitted into evidence.  A reasonable juror could find that in this incident Mr. Roberts made a sexual image available for viewing to a number of bystanders.

For Count 10, L.H. testified that the explicit image she found in her front gate was not immediately visible.  Still, the gate itself opened onto the public sidewalk of a residential street which had "some" foot traffic in the evening.  The paper with the image, while folded, was visible from the street and could have been grabbed by anyone walking by.  Moreover, the piece of paper with the image could easily have been taken and viewed by any of the other occupants of L.H.'s home, including L.H.'s mother and children.  A reasonable juror could find that in this incident Mr. Roberts at a minimum made a sexual image available for viewing to the other occupants of L.H.'s home.

Finally, for Count 11, L.H.'s car was parked on the public residential street where she lives when she found the explicit image on her windshield.  The piece of paper on which the image was printed was prominently enough placed that L.H. was able to see it from across the street when she opened her front door at around 8 a.m.  L.H.'s street has "very heavy" morning traffic from as early as 6 a.m. onward.  A reasonable juror could find that in this incident Mr. Roberts made a sexual image

available for viewing to a number of bystanders as well as to the other occupants of L.H.'s home.

In sum, viewing the evidence in the light most favorable to the verdict, a rational trier of fact could find beyond a reasonable doubt that Mr. Roberts made the images at issue available for viewing by individuals other than L.H. We note that the trial court, although not the factfinder in this case, reached the same conclusion. In discussing the jury instructions with counsel, the trial court noted that the places in which the images were displayed by Mr. Roberts were "clearly public places" and that there was "not a question" as to whether the images were "visible to the public view." A reasonable jury could reach the same conclusion.

## C.

Mr. Roberts also argues that (1) L.H. was not sufficiently "identified or identifiable" with respect to the images at issue and (2) the images for Counts 8-11 were not adequately identified at trial. We find neither argument persuasive.

**1.**

We first consider whether there was adequate evidence that L.H. was "identified" within the meaning of the unlawful-disclosure statute. The unlawful-disclosure statute prohibits disclosure of a sexual image of another "identified or identifiable person." D.C. Code § 22-3052(a). As to each unlawful-disclosure count, either L.H., her mother, or both identified L.H. as the person depicted in the image at issue. For Count 7, L.H. and her mother both identified L.H. as the individual depicted in the sexual image that was taped to the door of their home. For Count 8, L.H. testified that the picture she pulled off of her windshield was a sexually explicit image of her, that Mr. Roberts had written her name on the picture, and that the stack of explicit pictures Mr. Roberts held out his window in the laundromat parking lot were also of her. For Count 9, L.H. testified that the explicit picture Mr. Roberts held out of his car window at the intersection was of her. For Count 10, L.H. testified that the explicit image she found folded and placed on her front gate was one of the pictures that Mr. Roberts had previously shown her. Although L.H. did not state which specific sexual image of her had been placed on the gate, she testified at other points that Mr. Roberts had taken three sexually explicit photos of her and she identified herself in all three. Finally, for Count 11, L.H. testified that

the photo she found on her windshield was one of the sexually explicit pictures of her.

In sum, for all of the counts, there was direct testimony by L.H. identifying herself as the person depicted in each of the sexually explicit images at issue. Presented with this testimony, as well as the other contextual evidence that L.H. was the person depicted in the images (including, for example, L.H.'s mother's testimony that the image in Count 7 was of L.H.; the fact that L.H.'s name was written on some of the images; and the fact that some of the images were displayed on L.H.'s car or on or near her home), a reasonable jury could conclude that the person depicted in the images displayed by Mr. Roberts was "identified" within the meaning of the unlawful-disclosure statute.

We are not persuaded by Mr. Roberts's arguments to the contrary. At times Mr. Roberts has seemed to suggest that a sexual image can be "identified or identifiable" for purposes of the unlawful-disclosure statute only if the person depicted in the image is or can be identified from the image itself, without regard to the context in which the image is disclosed. At oral argument, however, Mr. Roberts acknowledged that the context in which an image was disclosed may be considered in determining whether the image was "identified or identifiable." We agree with

Mr. Roberts's acknowledgment at oral argument. Nothing in the text of the unlawful-disclosure statute suggests that the person depicted in a sexual image must be identified or identifiable based on the image itself rather than based on the combination of the image and the circumstances surrounding the disclosure of the image. We would be reluctant to read in such a limitation without any textual basis. *Cf. generally*, *e.g.*, *Gomez v. United States*, 490 U.S. 858, 874 (1989) ("It is incongruous to assume that Congress implicitly required such review for jury selection yet failed even to mention that matter in the statute."). More importantly, such a limitation would lead to absurd consequences. Under that view of the statute, a defendant could with impunity disclose a sexual image that by itself was not identifiable, but then tell everyone orally who was depicted in the image. We decline to read in an implicit limitation that would permit easy circumvention of the unlawful-disclosure statute's evident purpose. *See generally, e.g.*, *Wade v. United States*, 173 A.3d 87, 95 (D.C. 2017) ("When interpreting statutes, we assume that the legislature acted logically and rationally and we avoid interpretations of statutes which lead to implausible results.") (internal quotation marks omitted).

Mr. Roberts argues that the image at issue must have been identified or identifiable to someone in addition to the person depicted in the image. We hold to that contrary that it suffices that the person depicted in a sexual image can identify

himself or herself in the image. (We express no view about the proper disposition of cases in which the image is identified or identifiable only by the defendant.)

Nothing in the text of the unlawful-disclosure supports imposition of a requirement that the image be identified or identifiable by someone in addition to the person depicted in the image. As previously noted, we would be reluctant to read in such a limit in the absence of textual support in the statute. *Gomez*, 490 U.S. at 874. We also are uncertain as to how such a limitation would operate. In the present case, for example, once L.H. identified herself to law enforcement (and later to the jury) as the person depicted in the images, persons in addition to L.H. could identify the images as depicting L.H. Thus, either (1) the proposed limitation would have no practical significance or (2) there is an as-yet-unarticulated limitation on the types of contextual information that could be considered in determining whether a sexual image is "identified or identifiable" by someone in addition to the person depicted in the image. We acknowledge that the interests the unlawful-disclosure statute is designed to protect are at their zenith when third parties would know who was depicted in the disclosed sexual images. But even if third parties would not necessarily know who was depicted in such images, public disclosure of such images would doubtless cause anguish to the person who knew that he or she was depicted and thereby could be used to "shame, embarrass, degrade, control, and punish" that

person.  Report on Bill 20-903 at 3 (internal quotation marks omitted).  We thus see no basis for failing to interpret the statute, as it is written, to permit conviction when the disclosed images are identified by the person depicted in the images.

**2.**

We also are satisfied that the images at issue were adequately identified at trial.  L.H.'s testimony, as described above, provided a sufficient basis for the jury to conclude, on each count, that Mr. Roberts disclosed a sexual image depicting L.H.  To the extent that Mr. Roberts suggests that a physical copy of the actual image alleged to have been disclosed must be introduced into evidence, a victim's testimony alone can be sufficient to support a conviction even in the absence of corroborating evidence.  *McCoy v. United States*, 781 A.2d 765, 769 (D.C. 2001).  To the extent that Mr. Roberts suggests that there may have been procedural errors in the admission of certain photographic exhibits, any such errors would not affect the sufficiency of the evidence.  *See Best v. United States*, 66 A.3d 1013, 1019 (D.C. 2013) ("We evaluate sufficiency based on the evidence that was before the trial court, even if it was admitted erroneously.").  Moreover, Mr. Roberts did not object at trial to the admission of these exhibits, so we could reverse on this basis only if the trial court had committed plain error warranting reversal despite the absence of

objection in the trial court. *See generally, e.g.*, *Miller*, 209 A.3d at 78 (claims raised for first time on appeal are subject to plain-error review, which permits reversal only if error was plain, affected substantial rights, and "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings") (internal quotation marks omitted). We see no such plain error in this case.

In sum, we conclude that a rational jury assessing the evidence admitted at trial could find Mr. Roberts guilty beyond a reasonable doubt on all five unlawful-disclosure counts.

## IV.

Finally, we address Mr. Roberts's assertion that the evidence was insufficient to support his three threats convictions. We conclude that the evidence was sufficient.

To support a threats conviction, the prosecution must prove beyond a reasonable doubt that the defendant (1) communicated with another person in a manner that an "ordinary hearer would reasonably" understand to be a threat to do bodily harm and (2) "acted with the purpose to threaten or with knowledge that [the

defendant's] words would be perceived as a threat." *Carrell*, 165 A.3d at 319-20, 325 (brackets and internal quotation marks omitted). (*Carrell* left open whether it would suffice that the defendant acted recklessly with respect to the possibility that the communication at issue would be taken as a threat, *id.* at 324, and we also have no occasion to address that issue.)

Two of the communications at issue facially threaten bodily harm to L.H. The August 22, 2015 voicemail stated "When I see you baby, I'm a try to kill you Bitch." The October 3, 2015 email sent by Mr. Roberts to L.H. stated "I'll see u tomorrow bitch die with your mother and kids." Even if it is true, as Mr. Roberts argues, that "die bitch" can be "a common urban phrase" said to persons one does not like, a jury could still reasonably conclude that an ordinary person in L.H.'s position would read both of these communications as intentional threats to do bodily harm. *See generally, e.g.*, *Rose v. United States*, 49 A.3d 1252, 1259 (D.C. 2012) ("When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the [factfinder].") (internal quotation marks omitted). That is particularly true given that the jury was required to consider those communications in light of the entire course of Mr. Roberts's prior conduct, which had been threatening and violent. *See generally, e.g.*, *Gray v. United States*, 100 A.3d 129, 134, 136 (D.C. 2014) (jury assessing how ordinary hearer

would interpret statements must consider the "full context in which the words are spoken," including "the relationship between the speaker and hearer, and their shared knowledge and history") (internal quotation marks omitted).

The third communication, on August 28, 2015, is a slightly closer call. Mr. Roberts's statements in that voicemail -- "I'm going to make your life a living fucking hell" and "You going to answer, watch" -- do not in isolation unambiguously threaten bodily harm. Here too, however, the jury could view the remark as an intentional threat to inflict bodily harm, given Mr. Roberts's prior conduct. *See, e.g.*, *Andrews v. United States*, 125 A.3d 316, 325 (D.C. 2015) ("There may be all the more reason to construe an ambiguous statement as threatening when it is made in the context of a volatile or hostile relationship"; concluding that reasonable jury could find text messages stating "You done fucked up you stupid bitch," "That's your ass," and "I can't wait till you get home," would have conveyed reasonable fear of bodily harm) (internal quotation marks omitted).

Mr. Roberts argues that L.H.'s responses to his communications indicated that L.H. did not actually understand his words to threaten bodily harm. Whether L.H. subjectively felt such fear, however, is not determinative of whether Mr. Roberts's words would convey fear of bodily harm to the ordinary hearer under the

circumstances. *Gray*, 100 A.3d at 135. Moreover, there was evidence that L.H. was frightened by Mr. Roberts's conduct and communications to her. L.H. also testified that Mr. Roberts was "getting angrier and angrier" and gave the impression that he would not give up and would "do anything he [could] to make [her] life a living hell." Presented with this evidence, a jury could reasonably conclude that all three of the communications at issue would have conveyed fear of bodily harm to an ordinary person in L.H.'s circumstances.

Finally, Mr. Roberts argues that he lacked the requisite mens rea. Specifically, he asserts that his communications were intended only as threats to "embarrass, humiliate, or upset [L.H.]" and that L.H.'s responses supported his reasonable belief that she was not taking him seriously and did not believe he posed any physical threat to her or her family. Viewing all of the previously discussed evidence in the light most favorable to the verdict, we are confident that a reasonable jury could conclude otherwise and find beyond a reasonable doubt that Mr. Roberts acted with the purpose to threaten bodily harm to L.H.

For the above reasons, we affirm Mr. Roberts's conviction for unlawful disclosure on Count 7. We vacate Mr. Roberts's convictions for unlawful disclosure

on Counts 8-11 and remand for further proceedings as to those convictions. We affirm Mr. Roberts's threats convictions.

*So ordered.*

THOMPSON, *Associate Judge*, concurring in part and dissenting in part: I join Judge McLeese's opinion for the court except for the portion thereof that vacates appellant's conviction based on the incident in which he left one of the images of L.H., apparently face up, on the windshield of appellant's car in the parking lot of the busy laundromat in the busy Penn-Branch Shopping Center (Count 8 of the indictment). The evidence was that other cars and other people were in the parking lot. I see no reasonable probability that reasonable jurors, properly instructed that to find appellant guilty of unlawful disclosure they must find that he made the image available for viewing by a third party (and not just available for viewing by complainant L.H.), could have failed to find that appellant made the image available for viewing by third parties who were outside in the area of the laundromat (even if no third party actually saw the image). In other words, "it appears beyond a reasonable doubt that the [instructional] error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999) (internal

quotation marks omitted). I would therefore affirm appellant's conviction on Count 8.