*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# District of Columbia
# Court of Appeals

**No. 21-CO-167**

DON D. PAGE,
            Appellant,

    v.                                          **2013 CF1 12342**

UNITED STATES,
            Appellee.

BEFORE:    Thompson and Easterly,* Associate Judges, and Washington, Senior Judge.

## PUBLISHED JUDGMENT
(FILED—July 22, 2021)

On consideration of appellant's motion for summary reversal, appellee's opposition and cross-motion for summary affirmance, appellee's motion to file its lodged appendix under seal, appellant's motion for an extension of time to file his lodged opposition, and the record on appeal, it is

ORDERED that appellee's motion to file its appendix under seal is granted and the Clerk shall file and seal appellee's lodged appendix. It is

FURTHER ORDERED that appellant's motion for an extension of time to file his opposition is granted and the lodged opposition is filed. It is

FURTHER ORDERED that appellant's motion for summary reversal is denied. *See Watson v. United States*, 73 A.3d 130, 131 (D.C. 2013). It is

FURTHER ORDERED that appellee's cross-motion for summary affirmance is granted. *See id.* Appellant, who is 30 years old and has served about half of the 14-year sentence the trial court imposed after his guilty plea to second-degree

2

murder, challenges the trial court's denial of his motion, filed pursuant to D.C. Code § 24-403.04 (2020 Repl.), for compassionate release. A supplement to appellant's October 2020 motion advised the court that appellant tested positive for COVID-19 in December 2020 but has since recovered. The court found after an evidentiary hearing and based on guidance from the Centers for Disease Control and Prevention (CDC) that although appellant's medical conditions (his COVID-19 history and its lingering effects, his moderate-to-severe asthma, and his history of smoking) increase his risk of severe consequences should he be reinfected with COVID-19 illness, cases of reinfection are "rare" and there is a "relatively low risk" that appellant will become reinfected. The court also cited the falling COVID-19 infections rates at the facility where appellant is incarcerated and the facility's progress on vaccinating staff and inmates, and found that there was "every reason to believe" that appellant would soon receive the COVID-19 vaccination, alleviating the risk that COVID-19 poses to his health.[1] The court therefore concluded that appellant had not shown an extraordinary and compelling reason for release. The court did not reach the issue of whether appellant is "a danger to the safety of any other person or the community." D.C. Code § 24-403.04(a).

Under D.C. Code § 24-403.04(a), an individual who does not meet the specific criteria for eligibility spelled out in the statute can establish eligibility for release by showing that "[o]ther extraordinary and compelling reasons warrant a [sentence] modification." Appellant first argues that the trial court wrongly required him to establish a likelihood of infection in order to establish an extraordinary and compelling reason for release. We disagree. While appellant is correct that the statute does not specifically require an applicant for compassionate release to establish a likelihood of infection, information regarding appellant's risk of reinfection was relevant to the trial court's determination of whether his proffered reason for release — medical conditions that made him more susceptible to severe COVID-19 — constituted an "extraordinary and compelling" reason warranting a sentence modification. The legislative history shows that the Council of the District of Columbia intended for trial courts to exercise "appropriate discretion to review the compelling facts of a case," Committee on the Judiciary & Pub. Safety, Council

---

[1] The court cited in addition the reasoning of "multiple federal courts" that "the fact that an inmate has had and recovered from COVID-19 cuts against a claim of extraordinary and compelling reasons for release."

**No. 21-CO-167**

of the District of Columbia, Report on Bill No. 23-127 ("Committee Report") at 28-29 (Nov. 23, 2020), and thus afforded them discretion to consider any reasonable factor that directly impacts on the determination of whether an applicant is "at risk of severe illness or death from COVID-19." We are satisfied that the trial court did not err in taking into account the likelihood of reinfection by COVID-19 in determining whether appellant demonstrated "extraordinary and compelling reasons" for compassionate release. *See* Committee Report at 28 n.118 (citing with approval a Superior Court order which the Council characterized as granting compassionate release on the ground that the prisoner's "medical conditions placed him at an increased risk of contracting COVID-19 and of suffering severe illness from it").

Appellant also argues that the trial court lacked a firm factual foundation to determine that he had a low risk of reinfection. Upon review of the record, we conclude that the trial court did not err in finding that appellant had a low risk. His expert witness, emergency physician Ronald Paynter, testified upon a review of appellant's medical records that appellant's risk of reinfection was lower than his initial risk of infection and that vaccination would also lessen the risk of reinfection. That testimony, along with the CDC guidance about the "rare" risk of reinfection, the availability of vaccinations, and the low number of infections at appellant's correctional facility as of the date of the trial court's ruling, supported the court's conclusion that appellant had a low risk of reinfection. *Cf., e.g., United States v. Alford*, No. 08-374, 2021 U.S. Dist. LEXIS 76509, at *16-20 (W.D. Pa. April 21, 2021) (denying compassionate release to an applicant with hypertension, obesity, prediabetes, and a history of smoking who had previously contracted COVID-19 and was housed in a facility with only one active case); *United States v. Dinehdeal*, No. 3:16-CR-30107-RAL, 2021 U.S. Dist. LEXIS 55832, at *8-13 (D.S.D. March 24, 2021) (acknowledging that Dinehdeal's obesity and type 2 diabetes increased his risk of severe illness from COVID-19, but focusing on the "pertinent inquiry" of whether Dinehdeal was at risk for reinfection of COVID-19; noting that CDC guidance, other medical resources, and the developing body of scientific research indicated that reinfection was rare and, if it did occur, the outcome was likely to be less severe; noting that Dinehdeal's correctional facility had zero active COVID-19 cases among inmates, four active COVID-19 cases among staff, and few deaths from COVID-19; citing the Bureau of Prisons (BOP) implementation of a vaccination

**No. 21-CO-167**

program; and concluding for those reasons that Dinehdeal had not established an extraordinary and compelling reason for release).[2]  While the trial court did not address the impact of COVID-19 variants or incarceration on the vaccine's ability to prevent reinfection, appellant did not elicit any testimony from his expert regarding those issues.  It may remain to be seen how the availability of vaccines should be evaluated where large numbers of staff or inmates have declined vaccinations or where COVID-19 variants are in increasing circulation, but based on the evidence that was before the trial court, we are unable to say that the court abused its discretion in concluding that appellant failed to show an extraordinary and compelling case for his release.

While appellant argues that the CDC's guidance had not been updated, his own expert's testimony did not contradict the guidance.  Additionally, appellant argues that the trial court erred in relying on information concerning vaccination efforts by the BOP.  The court primarily relied on the vaccination information on the BOP's public coronavirus website, which appellant also cited in his filings when

---

[2] *See also, e.g.*, *United States v. Morrison*, No. 5:10-CR-00025-KDB-DCK-1, 2021 U.S. Dist. LEXIS 108588, at *7-8 (D.N.C. June 10, 2021) (agreeing that the defendant "cannot meet his burden of establishing that his risk of contracting COVID-19 is an extraordinary and compelling reason for a sentence reduction when he has already contracted—and beaten—the virus"); *United States v. Jenkins*, No. 4:15-cr-00016-SEB-VTW-01, 2021 U.S. Dist. LEXIS 31174, at *10 (S.D. Ind. Feb. 19, 2021) (court "has declined to find extraordinary and compelling circumstances warranting a sentence reduction when a defendant has recovered from COVID-19," "even when that defendant has risk factors for severe symptoms"; "fact that the BOP is now actively vaccinating inmates against COVID-19 . . . only underscores the speculative nature of any concern about reinfection"); *United States v. Hilliard*, No. 17-CR-35-01 (VB), 2021 U.S. Dist. LEXIS 29785, at *3 (S.D.N.Y. Feb. 17, 2021) (where defendant had already recovered from COVID-19 and risk of reinfection was low, "sentence reduction based on the risk of contracting the virus again ma[d]e[ ] no sense"); *United States v. Marley*, No. 16-CR-374 (VEC), 2020 U.S. Dist. LEXIS 244692, at *9 (S.D.N.Y. Dec. 30, 2020) ("defendant's successful recovery from COVID19 weighs against granting . . . compassionate release," and "[w]ith the vaccine rollout underway in the United States, the Court anticipates that Mr. Marley will receive a vaccine well in advance of his becoming susceptible to reinfection").

No. 21-CO-167

providing updated case numbers, and it was entitled to do so. *See In re Estate of Barfield*, 736 A.2d 991, 995 n.7 (D.C. 1999) (explaining that the trial court is entitled to take judicial notice of matters of public record). It is

FURTHER ORDERED and ADJUDGED that the order on appeal is affirmed.

ENTERED BY DIRECTION OF THE COURT:

JULIO A. CASTILLO
Clerk of the Court

* EASTERLY, *Associate Judge*: After considering medical records and expert testimony presented by Mr. Page, who fell ill from COVID-19 while his motion for compassionate release was pending, the Superior Court determined that "Mr. Page's medical conditions increase his risk of severe disease if he contracts the coronavirus again." Even so, the court determined Mr. Page had not established an extraordinary and compelling reason to make himself eligible for a sentence reduction under D.C. Code § 24-403.04(a)(3) (2021 Supp.), because he had not shown that he was likely to be reinfected while in prison.[3] The Superior Court was wrong to require Mr. Page to make such an additional showing. The compassionate release statute, which was enacted in response to the ongoing COVID-19 pandemic, contains no textual foundation for requiring prisoners to show that they are likely to be infected with COVID-19 while in a congregate, carceral setting. And the legislative history refutes the notion that the Council of the District of Columbia intended to restrict access to compassionate release in this manner. It reveals instead that the Council presupposed a likelihood of infection with COVID-19 for all D.C. prisoners (who are housed in federal prisons all over the United States) and was singularly concerned about the *consequence* of infection—specifically, the

---

[3] Having concluded that Mr. Page was ineligible for a sentence reduction on this basis, the Superior Court did not reach the second statutory requirement that Mr. Page prove, by a preponderance of evidence, *see Bailey v. United States*, 251 A.3d 724 (D.C. 2021), that he is not presently dangerous, *see* D.C. Code § 24-403.04(a).

possibility that individuals serving terms of imprisonment would inadvertently suffer a harsher punishment of severe illness or even death because of their vulnerability to the disease. The majority thus affirms a misreading of the statute and oversteps its bounds by erecting an additional barrier to compassionate release in contravention of the will of the Council.

Between March 11 and March 13, 2020, the World Health Organization declared COVID-19 a global pandemic,[4] the President of the United States declared a national emergency,[5] and the Mayor of the District of Columbia declared a public health emergency in D.C.[6] A month later, on April 10, 2020, the Council of the District of Columbia passed emergency legislation that, among other things, authorized Superior Court judges to grant compassionate release to D.C. prisoners who faced serious risk of severe illness or death from COVID-19.[7] In the months that followed, the Council renewed this authority in emergency and temporary legislation.[8] And at the end of December 2020, the Council passed permanent legislation that largely mirrored the preceding emergency and temporary

---

[4] *Timeline: WHO's COVID-19 Response*, World Health Org., https://www.who.int/emergencies/diseases/novel-coronavirus-2019/interactive-timeline https://perma.cc/Y4T7-AWSK (last visited July 6, 2021).

[5] Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15,337 (Mar. 18, 2020). The Secretary of Health and Human Services had already declared a Public Health Emergency under the Public Health Service Act for the COVID-19 pandemic. Determination that a Public Health Emergency Exists Nationwide as the Result of the 2019 Novel Coronavirus, U.S. Dep't of Health & Human Servs. (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx https://perma.cc/ZWC3-H78C.

[6] Mayor's Order 2020-45: Declaration of Public Health Emergency – Coronavirus (COVID-19), Exec. Off. of the Mayor (Mar. 11, 2020), https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/MO.DeclarationofPublicEmergency03.11.20.pdf https://perma.cc/TL7Y-2BMP.

[7] D.C. Act 23-286 § 305, 67 D.C. Reg. 4178 (Apr. 10, 2020).

[8] *See* D.C. Act 23-326 § 706, 67 D.C. Reg. 7045 (May 27, 2020); D.C. Act 23-328 § 706, 67 D.C. Reg. 7598 (June 8, 2020); D.C. Act 23-405 § 706, 67 D.C.

No. 21-CO-167

legislation[9] and conferred compassionate release authority on Superior Court judges. This permanent legislation was signed by the Mayor on January 13, 2021.

In its permanent form, the statute dictates that compassionate release "shall" be granted to D.C. prisoners who demonstrate both their eligibility and nondangerousness under D.C. Code § 24-403.04(a). In addition to defining two eligibility groups with specificity—prisoners with a terminal illness and prisoners over age 60 who have served at least 20 years in prison, D.C. Code § 24-403.04(a)(1)–(2)—the statute includes a catchall provision for prisoners who demonstrate "extraordinary and compelling reasons" for modification of their sentence, D.C. Code § 24-403.04(a)(3). This catchall category "includ[es]," *inter alia*, those prisoners who are over age 60, have "served the lesser of 15 years or 75% of [their] sentence," and "[s]uffer[] from a chronic or serious medical condition . . . that causes an acute vulnerability to severe medical complications or death as a result of COVID-19." D.C. Code § 24-403.04(a)(3)(B).

The Superior Court correctly determined that, under this catchall provision, a D.C. prisoner can demonstrate eligibility for compassionate release by showing that they are at risk for severe illness from COVID-19, regardless of age or time served. This understanding of D.C. Code § 24-403.04(a)(3)(B) is both (1) supported by its plain text, *see Aboye v. United States*, 121 A.3d 1245, 1249 (D.C. 2015) ("[T]he participle *including* typically indicates a partial list." (internal quotation marks omitted)); *Edwards v. United States*, 583 A.2d 661, 664 & n.3 (D.C. 1990) ("Where general words [precede or] follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the . . . specific words." (footnote omitted) (quoting 2A N. Singer, Sutherland Statutory Construction § 47.17, at 166 (4th ed. 1984))), and (2) confirmed by its legislative history. In the report addressing a bill to make what had been emergency and temporary legislation permanent, the Committee on the Judiciary and Public Safety approvingly noted that since the compassionate release statute had been enacted

---

Reg. 10235 (Aug. 19, 2020); D.C. Law 23-130 § 706, 67 D.C. Reg. 8622 (Oct. 9, 2020); D.C. Act 24-30 § 706, 68 D.C. Reg. 3101 (Mar. 17, 2021).

[9] *Compare* D.C. Act 23-286 § 305, 67 D.C. Reg. 4178 (Apr. 10, 2020), *with* D.C. Law 23-274 § 1203, 68 D.C. Reg. 1034 (Apr. 27, 2021).

No. 21-CO-167

> Superior Court judges have consistently interpreted the "[o]ther extraordinary and compelling reasons" language
>
> in D.C. Code 24-403.04(a)(3) as including relief to defendants whose age, medical conditions, or other circumstances increase their vulnerability to death or severe illness from COVID-19, for example, even if they do not meet the definition of "elderly" based on their age or length of imprisonment, and even if their medical conditions do not rise to the level of "terminal" or "debilitating."

Report on Bill No. 23-127 before the Comm. on the Judiciary & Pub. Safety, Council of the District of Columbia at 27–28 (Nov. 23, 2020) (alteration in original). The Committee Report then favorably cited more than a dozen Superior Court orders granting compassionate release on this basis, *id.* at 28 n.118, and endorsed these rulings as examples of Superior Court judges "appropriate[ly] [exercising their] discretion to review the compelling facts of a case," *id*. at 28–29.[10]

Employing this legislatively-approved construction of the catchall provision, the Superior Court found that Mr. Page was at risk for severe illness from COVID-19. But the court did not end its eligibility analysis there. Instead, the court went on to separately address Mr. Page's "[l]ikelihood of reinfection." While the court did not "discount the possibility that . . . Mr. Page may be one of the unlucky" prisoners at the BOP facility where he was then incarcerated who could be reinfected, the court concluded that "the possibility of reinfection in this case is low." Considering both Mr. Page's "higher risk . . . of serious consequences should [he] become reinfected with COVID-19" and the "relatively low risk that he will become

---

[10] My colleagues in the majority quote this language to support their determination that the Council gave Superior Court judges unfettered discretion to incorporate a prisoner's likelihood of infection as a factor in an assessment of eligibility for compassionate release. But they simply ignore the fact that the "appropriate [exercise of] discretion" being endorsed by the Council was the Superior Court's expansive interpretation of the catchall provision to render eligible any prisoner at risk of serious illness or death from COVID-19.

No. 21-CO-167

reinfected," the court concluded that Mr. Page was ineligible for compassionate release.

The Superior Court erred by denying Mr. Page's motion for compassionate release by requiring him to make an additional showing beyond that which is contemplated in the compassionate release statute, regarding a circumstance the Council had already legislatively validated.

As the majority of the division concedes, *ante* at 2, the Superior Court's consideration of the likelihood of infection (or reinfection) with COVID-19 has no foundation in the text of the District's compassionate release statute, *see Davis v. United States*, 397 A.2d 951, 956 (D.C. 1979) ("We must first look at the language of the statute by itself to see if the language is plain and admits of no more than one meaning.").[11] The language of the compassionate release catchall contains no reference to vulnerability to infection from COVID-19. Rather, the inclusive catchall references only a prisoner's vulnerability to the *consequence* of infection, in the form of severe adverse health effects or death, *see* D.C. Code § 24-403.04(a)(3)(B)(iii).

Further, the legislative history makes it pellucidly clear that the Council, in drafting this statute, operated from the premise that it "is beyond doubt and could hardly be overstated" "that individuals in jails and prisons are particularly vulnerable during this pandemic," *see Mitchell v. United States*, 234 A.3d 1203, 1211 n.13

---

[11] Indeed, the Superior Court's consideration of the likelihood of infection in assessing eligibility for compassionate release has no foundation full stop. The court provided no explanation for why it determined, over Mr. Page's objection, that this consideration was a legitimate component of an eligibility analysis under the compassionate release statute.

The Superior Court did note at one point that "multiple federal courts have concluded [that] in the context of the federal compassionate release statute, the fact that an inmate has had and recovered from COVID-19 cuts against a claim of extraordinary and compelling reasons for release." But whether a prisoner's previous illness with COVID-19 increases or decreases their risk of severe illness in the future and thus cuts for or against compassionate release under D.C. Code § 24-403.04(a)(3) is a different question from whether it is likely that a prisoner will be reinfected with COVID-19.

No. 21-CO-167

(D.C. 2020).[12] The Council thus made vulnerability to the consequences of infection with COVID-19 its exclusive concern.

The Council's presupposition that D.C. prisoners were at increased risk of infection from COVID-19 was evident from the outset of its discussion of the compassionate release legislation. At a legislative meeting on April 7, 2020, Councilmember Charles Allen quoted a Washington Post article that described jails and prisons, like nursing homes and cruise ships, as "perfect incubators" for COVID-19, and warned:

> The real danger is in doing nothing, on the belief that what takes place in penal institutions is less critical or somehow separate from society — or that the lives of convicts are worth less than those of free men and women. In fact, prisons and jails are porous places; their walls do nothing to impede the spread of disease. The failure to contain the virus on the inside, for whatever reason, will accelerate its proliferation on the outside.[13]

---

[12] *See id*. (citing Joshua Rich, *Coronavirus Disproportionately Harms U.S. Prison Population*, UCLA Newsroom (July 8, 2020), https://newsroom.ucla.edu/releases/coronavirus-disproportionately-harms-u-s-prison-population https://perma.cc/9BWS-YADP ("People incarcerated in U.S. prisons tested positive for COVID-19 at a rate 5.5 times higher than the general public.") and *A State-by-State Look at Coronavirus in Prisons*, Marshall Project (Aug. 6, 2020), www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons https://perma.cc/6S7P-AFA7 (counting, as of August 6, 2020, about 86,000 infected in our nation's prisons)); *see also* Gregory Hooks & Wendy Sawyer, *Mass Incarceration, COVID-19, and Community Spread*, Prison Policy Initiative (Dec. 2020), https://www.prisonpolicy.org/reports/covidspread.html#summary https://perma.cc/3GX2-72XC (documenting that over half a million new cases of COVID-19 in the summer of 2020—or roughly 13% of all new cases in the United States—were attributable to mass incarceration).

[13] D.C. Council, Twenty-Seventh Legislative Meeting at 47:40 (Apr. 7, 2020) (quoting Editorial Board, *Officials Must Work Quickly to Help Prevent the Coronavirus in Prisons*, Wash. Post (Mar. 17, 2020),

No. 21-CO-167

Similarly, Councilmember Kenyan McDuffie observed, "we know what happens when you have density, when people are living on top of one another basically."[14]

When the Judiciary Committee issued its report supporting passage of permanent compassionate release legislation seven months later, in November 2020, councilmembers reaffirmed their presupposition that D.C. prisoners are at a higher risk of contracting COVID-19 by virtue of being incarcerated. Now they had hard data to back up their earlier-expressed concerns. The Committee Report cited statistics about the number of infections/deaths in prisons and jails across the country (at the same time highlighting the inadequacy of the BOP's reports regarding D.C. prisoners). Report on Bill No. 23-127 at 24–25. After noting that black and latinx individuals "experience higher rates of disease and illness overall" and are significantly more likely to contract COVID-19 in the community, the Committee Report noted that these communities are disproportionately incarcerated, *id.* at 25, and that "in the jail or prison congregate care setting, poor outcomes for incarcerated individuals have . . . flourished," *id*. at 25–26; *see also id.* at 24–25 (acknowledging that more than 250,000 incarcerated individuals had been infected with COVID-19 as of the beginning of November 2020). Fittingly, in the discussion of the expansive interpretation of the compassionate release eligibility catchall provision, *see supra*, the Committee Report favorably cited a number of Superior Court cases which acknowledged the "inherently" heightened risk of contracting COVID-19 while in a congregate, carceral setting. *See United States v. Kitt*, No. 1997 FEL 2334, at *5–6 (D.C. Super. Ct. Sept. 28, 2020) (explaining that the statistics regarding infection at the prisoner's facility "illustrate[d] the *inherent* risks posed by carceral settings to vulnerable inmates in the context of a global pandemic and . . . support[ed] the proposition that Mr. Kitt remains at risk *so long as he is incarcerated*" (emphases added) (internal quotation marks and citation omitted)).[15]

---

https://www.washingtonpost.com/opinions/officials-must-work-quickly-to-help-prevent-the-coronavirus-in-prisons/2020/03/16/054babf6-67b9-11ea-8012-fdc44a41cb4f_story.html https://perma.cc/PF9Q-Z2GW).

[14] *Id.* at 1:28:35.

[15] Without identifying it by name, the majority imprecisely and incompletely quotes from another Superior Court decision favorably cited by the Council, *United States v. Ayers*, No. 2008 CF3 20985 (D.C. Super. Ct. Aug. 13, 2020). But that decision, like numerous others listed in the Committee Report, reflects the same concern that prisoners are vulnerable simply by virtue of being held in prisons. *See*

No. 21-CO-167

In short, both the plain text of D.C. Code § 24-403.04(a)(3)—which says nothing about requiring a defendant to show a likelihood of infection—and the legislative history—which reveals that the Council foresaw that prisons would be petri dishes for COVID-19 and enacted the permanent compassionate release legislation based on that confirmed premise—compel the conclusion that the Superior Court exceeded its authority by requiring Mr. Page to make the additional showing that he was likely to be reinfected with COVID-19 while incarcerated. Per the statute, the task of the Superior Court in assessing eligibility for compassionate release under the catchall provision is only to assess whether a prisoner, were they to contract COVID-19, would be "vulnerabl[e] to severe medical complications or death." D.C. Code § 24-403.04(a)(3)(B)(iii).

It is true that vaccines were not yet widely available in the United States when the permanent compassionate release legislation was approved by the Council in December 2020 and signed by the Mayor in January 2021. But by December vaccines were anticipated, and by January millions of people, including at least some

---

*id*. at \*9 (concluding that "Defendant's medical diagnosis, *in combination with his confinement to a penal institution*, places Defendant at an increased risk for contracting COVID-19, and of suffering severe illness from it" (emphasis added)); *see also, e.g.*, *United States v. Montgomery*, No. 2015 CF2 11794, at \*3 (D.C. Super. Ct. May 29, 2020) (explaining that the compassionate release statute was one of "various efforts . . . currently underway to . . . release . . . detained individuals" because of the "unique challenges" faced by correctional facilities in controlling the spread of COVID-19 (internal quotation marks omitted)); *United States v. Jennings*, No. 2000 FEL 4515, at \*9–10 (D.C. Super. Ct. Oct. 30, 2020) (acknowledging there is "no dispute that the conditions of incarceration increase the risk that defendant might contract Covid-19"); *United States v. Bartrum*, No. 1990 FEL 2059, at \*12-13 (D.C. Super. Ct. June 16, 2020) (acknowledging the "particularly devastating impact [of COVID-19] within our jails and prisons").

In none of the cases favorably cited by the Council did the Superior Court determine that the prisoner-movant bore the burden to prove that he was at a heightened risk of contracting COVID-19, as the trial court did in this case.

No. 21-CO-167

BOP prisoners, had been vaccinated in this country.[16]  Thus we cannot presume the Council's compassionate release legislation was premised on the nonexistence of vaccines.   Moreover, the distribution of vaccines across the United States notwithstanding, the global pandemic is not over.  Federal and District of Columbia declarations of emergency remain in place.[17]  Prisons remain an ideal environment for transmission of this disease.[18]  Whether the eligibility criteria for compassionate

---

[16] *See Coronavirus (COVID-19) Vaccinations*, Our World in Data (last visited July 6, 2021), https://ourworldindata.org/covid-vaccinations?country=USA https://perma.cc/FAZ8-ZXJJ.

After early reports that BOP was reserving initial doses of the vaccine for its staff, the BOP publicly announced in December 2020 that some unspecified number of "high risk inmates in a few of the BOP facilities in different regions of the country ha[d] received the vaccine."  Michael Balsamo, *Reversing Course, Feds Say Some US Inmates Get Virus Vaccine*, Assoc. Press (Dec. 22, 2020), https://apnews.com/article/coronavirus-pandemic-prisons-d2c1a3013351ed42cf75a194e4661cf3  https://perma.cc/59BV-TK3G.

[17] *See* Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic, 86 Fed. Reg. 11,599 (Feb. 26, 2021); Renewal of the Determination that a Public Health Emergency Exists Nationwide as the Result of the Continued Consequences of Coronavirus Disease 2019 (COVID-19) Pandemic, U.S. Dep't of Health & Human Servs. (Apr. 15, 2021), https://www.phe.gov/emergency/news/healthactions/phe/Pages/COVID-15April2021.aspx   https://perma.cc/WB7G-FAQH; Mayor's Order 2021-69: Modified Measures for Spring/Summer 2021 of Washington, DC Reopening and Extension of Public and Public Health Emergencies, Exec. Off. of the Mayor (May 17, 2021), https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/attachments/Mayor%27s%20Order%202021-069%20Modified%20Measures%20for%20Spring%20Summer%202021%20of%20Washington%2C%20DC%20Reopening%20and%20Extention%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.pdf https://perma.cc/MS3U-4UTY.

[18] *See* Katie Park et al., *A Half-Million People Got COVID-19 in Prison. Are Officials Ready for the Next Pandemic?*, The Marshall Project (June 30, 2021), https://www.themarshallproject.org/2021/06/30/a-half-million-people-got-covid-

No. 21-CO-167

release should be revised and made more onerous by requiring an additional showing of likelihood of infection—when new variants of the COVID-19 virus have been identified,[19] demographic fault lines in vaccination have emerged that may keep the virus in circulation, at least regionally, for years to come,[20] and new cases are still being reported in Bureau of Prisons facilities where D.C. prisoners are incarcerated[21]—is quintessentially a policy question to be answered by the Council.

The fact that the Council expressly "welcome[d] ongoing empirical review of the legislation's implementation and efficacy," Report on Bill No. 23-127 at 29,

---

19-in-prison-are-officials-ready-for-the-next-pandemic https://perma.cc/8L46-BZAC.

[19] *See* Roni Caryn Rabin et al., *Masks Again? Delta Variant's Spread Prompts Reconsideration of Precautions*, N.Y. Times (June 29, 2021), https://www.nytimes.com/2021/06/29/health/coronavirus-delta-variant-masks.html https://perma.cc/ZC7Q-X5S4 (noting that studies have shown vaccines "are slightly less" effective against the "highly infectious" Delta variant than other variants, which "now accounts for one in four infections in the United States," and that "Dr. Anthony S. Fauci, the nation's top infectious disease doctor, has called the variant 'the greatest threat' to eliminating the virus in the United States"); Jen Christensen, *CDC Now Calls Coronavirus Delta Variant a 'Variant of Concern'*, CNN (June 15, 2021), https://www.cnn.com/2021/06/15/health/delta-variant-of-concern-cdc-coronavirus/index.html https://perma.cc/T8WW-LA9G.

[20] *See* Apoorva Mandavilli, *Reaching 'Herd Immunity' is Unlikely in the U.S., Experts Now Believe*, N.Y. Times (May 3, 2021), https://www.nytimes.com/2021/05/03/health/covid-herd-immunity-vaccine.html https://perma.cc/LJ9C-Q548 (reporting that "daily vaccination rates are slipping, and there is widespread consensus among scientists and public health experts that the herd immunity threshold is not attainable").

[21] *See COVID-19*, Fed. Bureau of Prisons (last visited July 6, 2021), https://www.bop.gov/coronavirus/ https://perma.cc/49JS-9KEL (reporting active cases at sixty-four BOP-managed facilities as of July 2, 2021); *but see Federal Facilities in the United States*, UCLA Law Covid Behind Bars Data Project (last visited July 6, 2021), https://uclacovidbehindbars.org/federal/#scorecard https://perma.cc/E7J8-BNUN (noting that "[t]rue case counts" in federal facilities "may be significantly higher than reported").

**No. 21-CO-167**

signals that it anticipated that it might need to make policy adjustments based on new data. Presumably, that data would include information about COVID-19 testing, vaccination policies, and vaccination rates for inmates and staff alike at BOP facilities, with a focus on D.C. prisoners.[22] If and when the Council determines the particular risk of infection with COVID-19 has sufficiently abated for D.C. prisoners, the Council can amend D.C. Code § 24-403.04, with emergency or temporary legislation if it desires (as it has already demonstrated it is able to do). In the meantime, the courts should apply the compassionate release statute as drafted by the Council. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring) ("When [elected] officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad . . . [and] should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." (internal quotation marks, citation, and brackets omitted)).

Because the majority affirms a misreading of the statute and oversteps its judicial role in imposing additional restrictions on eligibility for compassionate release, I respectfully dissent.

---

[22] The most recent data reflects that over half a million prisoners and prison staff in the United States have contracted COVID-19 but that number is likely an undercount because of gaps in testing in prison facilities. *See supra* note 19; *see also COVID-19 Recedes in Prisons, But Conditions Could Spell Future Outbreaks*, NPR (July 3, 2021), https://www.npr.org/2021/07/03/1012907942/covid-19-recedes-in-prisons-but-conditions-could-spell-future-outbreaks https://perma.cc/Z4MZ-5HR4.

**No. 21-CO-167**

Copies e-served:

Honorable Julie H. Becker

Director, Criminal Division

Samia Fam, Esquire

Shilpa S. Satoskar, Esquire
Paul R. Maneri, Esquire
Public Defender Service

Chrisellen R. Kolb, Esquire
Assistant United States Attorney

cml